## Case No. 17,694.
### The WILLIAM GRAY.
[1 Paine, 16.] [1]

Circuit Court, D. New York. Sept.·Term, 1810.

EMBARGO ACTS—CONSTRUCTION—VIOLATION THROUGH NECESSITY.

1. A vessel which during the existence of our embargo·laws, departed from one port in the United States on a voyage to another. but was obliged from irresistible necessity to put into a foreign port. and sell her cargo, was not guilty of a violation of those laws.

2. From a fair comparison of the different embargo acts with each other. it may be collected that congress meant expressly to make such an instance of necessity an exception to the penal operation of those acts.

3. But if congress have neglected to provide for such an exception. it is the duty of the courts to interpret those laws, as they do all penal statutes. by considering the exception as implied. Consent is essential to guilt; and the legislature is supposed to pass all penal laws with the understanding that courts will not inflict the penalties for such violations as are unintentional.

[Cited in U. S. v. Morris, Case No. 15,816; The Waterloo, Id. 17,257.]

4. This is not. therefore. one of those cases which are referred for mitigation to the secretary of the treasury.

This was an appeal from a sentence of condemnation in the district court of the [United States for the] Southern district of New York. The vessel was libelled on behalf of the

[1] [Reported by Elijah Paine. Jr., Esq.]

United States for a violation of the "Act laying an embargo on all ships and vessels in the ports and harbours of the United States" (4 Laws [Bior. & D.] 129 [2 Stat. 451]), and of the act supplementary to said act, and of the act in addition to said supplementary act. The libel stated that the William Gray was, on the first of January, 1809, at Alexandria, Virginia, bound for a foreign port, and afterwards, contrary to the provisions of the two first mentioned acts, proceeded from Alexandria to Antigua in the West Indies; and that certain goods, wares, and merchandises were exported in said vessel from the United States to Antigua, contrary to the provisions of the last mentioned act. The appellant, George Crosby, stated in his claim as owner of the vessel, that she was at Alexandria on the 30th of December, but not on the first of January, and denied that she was bound for a foreign port, or that she proceeded from Alexandria to Antigua, but that on the contrary she proceeded to Martha's Vineyard. The claim also denied that any goods were exported as alleged in the libel, except that the William Gray, with goods on board, was, while proceeding on her intended voyage from Alexandria to Boston, Massachusetts, driven by storms, tempests, stress of weather, and necessity, out of her course, and forced to proceed to Antigua, for the preservation of the vessel and cargo, and the lives of those on board. The claim further stated, that on the arrival of the William Gray at Antigua, the cargo was compelled to be sold by order of the government, against the will of the master and those concerned in it. It appeared from the testimony of the master, that the William Gray sailed from Alexandria on the 30th of December, bound on a voyage to Boston, with a cargo of flour consigned to several different persons in Boston. That they encountered a severe storm, from which the vessel suffered very seriously in her spars and rigging, and the master, mate, and two men were frozen and otherwise injured. On the 11th of January they arrived at Martha's Vineyard, where they repaired their shattered sails and rigging, and were in three days ready to proceed on their voyage to Boston, but were obliged to wait until the 20th before they could get a favourable wind. On that day they took a pilot for Boston, and made sail with a westerly wind, in company with several other vessels, and had a pleasant passage over the roads. In the evening they were abreast the table land of Cape Cod, when a violent gale commenced from the northwest, with a heavy sea; the vessel was kept close to the wind, with the intention of beating into Cape Harbour. In this they were unsuccessful, and from the 20th to the 22d they sometimes tried to lie to and sometimes were obliged to run before the wind. During this period the storm was so violent that their anchors were washed overboard, the bowsprit carried away, the foremast sprung, the maintopmast lost, and the spars, sails, and rigging so shattered that the vessel was de-

scribed as a wreck. The weather was so cold, the sea continually washing over them, that the men were unable to work. On the 22d the wind shifted to the southward, and they attempted to reach the land, but before they had gained half the distance to land the wind again changed to the westward, and blew another severe gale, until the 24th, during which period they lay to, and the vessel was greatly injured, so as to become, in the words of the witness, a perfect wreck. They were also almost out of water and provisions. In this situation it was determined to bear away for the West Indies for the safety of their lives. On the 21st of February they arrived at Antigua, where the master applied to the governor for leave to refit and proceed on his voyage to Boston. This request was refused by the governor, although repeated for several days. The captain then employed an agent to sell the cargo; and the vessel arrived at New-York on her return about the last of April. Charles Ramsdell, a witness on the same side, corroborated the testimony of the master throughout. This witness was a farmer, and never had been at sea before. He chartered the vessel from Kennebeck to Washington to take on a cargo of lumber. The owner, if he chose, was at liberty by their contract to take her after her arrival at Washington. Witness put on board an adventure for himself for Boston, and was on board the vessel until her arrival at New-York. He left Alexandria, as a passenger, for the purpose and with the expectation of returning directly to Boston. The flour was purchased at $4.50 at Alexandria, and sold for $21.50 at Antigua. The vessel took only 1060 barrels, but was able to carry 1700.

J. O. Hoffman and S. Harris, for appellants.
N. Sanford, Dist. Atty.

LIVINGSTON, Circuit Justice. In defence of the libel filed against this vessel for proceeding from the United States to the island of Antigua, contrary to the act laying an embargo, and the first act in addition thereto, the claimant alleges, that while on a voyage from Alexandria to Boston, she was driven by storms, tempests, stress of weather, and necessity, out of her course, and forced to proceed to that island for her own preservation and that of the cargo, and of the lives of the persons on board. Both the fact and the legal consequences deduced from it by the appellant, are denied by the counsel for the United States. In looking at the testimony, it cannot be denied that there is every reason to believe that the real destination of the William Gray was Boston. Two witnesses swear to this fact positively, and she had actually arrived at Martha's Vineyard on that voyage. Why it was not completed is very minutely accounted for. An attempt was made to reach Boston, but the inclemency of the season, the frozen and mutilated condition of several of the hands, and the wrecked state of the brig, are assigned as

reasons for not being able to effect this purpose. In this state of things it appears to have been unanimously thought necessary for the preservation of life, and on the advice of the pilot, to bear away for the West Indies, it being deemed impossible to return to any port on the continent of America. What the pilot advised to be done is a matter of fact, and may be proved as such by any witness. Such advice or conduct on his part cannot be classed, as has been done, with hearsay testimony. To this body of evidence the court is desired to oppose its own opinion as to the practicability of arriving at some one or other port within the United States. It is certain that a story may be so very improbable that although attested to by more than one credible witness, no one would be bound to believe it. But this is not of that description, although it does appear to the court somewhat extraordinary that a vessel so near the continent, and in so high a latitude, should not be able to make some part of it; yet, for aught it can know to the contrary, vessels quite as near, if not nearer, may have been blown off in the winter season, especially if in a shattered order, to the West Indies. It would, therefore, be unpardonable in either a jury or a court, merely because a fact appears somewhat improbable, to disregard the evidence establishing it, and to decide in conformity with its own opinion, unassisted by that of professional men, in the face of all the proofs in the cause.

In the judgment of this court, then, the alleged necessity is sufficiently made out. Whether it takes the case out of the statute is next to be considered. Were this res integra the very able argument on behalf of the United States would be entitled to the most respectful consideration. It is perhaps to be lamented that judges ever permitted themselves to make any exceptions to an act, which the legislature itself had not thought proper to incorporate within the body of it. The latitude which has been assumed in this way has very much added to the uncertainty of the written law of the land, and produced much litigation, which a firm adherence to its letter would have prevented. But it is too late for speculations of this kind. Their only use can be to make courts careful, and they cannot be too much so, never to depart, under the idea of preventing a particular hardship, from the plain and obvious meaning of the legislature. This restriction, which every judge should impose on himself, is not transcended when in the interpretation of penal statutes, any principle is applied, which is found in every code of laws divine or human, and has from time immemorial been ingrafted into the common law of the country from which our jurisprudence is borrowed. Where such rules or principles exist and have invariably and on all occasions governed courts in the administration of criminal justice, they become as much a part of the law, and are as obligatory on a court as the statute which it may be called on to expound. Of this kind is the one of which the appellants now claim the benefit; that the concurrence of the will in what is done, where it has a choice, is the only thing that renders a human action culpable, or in other words, that to make a complete offence, there must be both a will and an act. This axiom, as it may be termed, is applied as well to offences created by statute as to those which are such at common law. The variety of cases in which this absence of will excuses those who would otherwise be offenders, have been mentioned in the course of the argument, and among them we find that on which this defence proceeds, namely, an act which proceeds from compulsion and inevitable necessity. Whether the legislature might not by apt words punish an act taking place under such circumstances is foreign from the present inquiry: but where this is not done in terms, they are supposed to know that by the rules of the common law, it is always considered as excepted, and therefore do not make the exception themselves. The cases which have been produced by the appellant are as strong and conclusive as perhaps were ever submitted to a court in support of any proposition of law. If the necessity which leaves no alternative but the violation of law to preserve life, be allowed as an excuse for committing what would otherwise be high treason, parricide, murder, or any other of the higher crimes, why should it not render venial an offence which is only malum prohibitum, and the commission of which is attended with no personal injury to another. The court, therefore, cannot but yield to the weight of so many authorities, especially too when every decision accords with reason, common sense, and the feelings of mankind, which are universal and indelible. But is it so very clear that the law itself does not make the exception? The court is inclined to think, that on a fair comparison of the different acts with each other, this will be found to be done. The legislature, by some of the provisions of the enforcing law, as it is called, certainly appear to have been of the same opinion. The court, therefore, thinks that the necessity which is proved to have existed, excused the party from all guilt, and of course from the forfeiture which is sought; and that none having accrued, it is not among those cases which are referred for mitigation to the secretary of the treasury.

The sentence of the district court must accordingly be reversed.