UNITED STATES of America,
Plaintiff-Appellee,

v.

Julienne Jesse MAY et al.,
Defendants-Appellants.

Nos. 79–1142 through 79–1217 and
79–1255 through 79–1260.

United States Court of Appeals,
Ninth Circuit.

July 3, 1980.

Irwin Schwartz, Federal Public Defender, Fred Diamondstone, Seattle, Wash., for defendants-appellants.

Francis J. Diskin, Seattle, Wash. (argued), Richard B. Jones, Seattle, Wash., on brief, for plaintiff-appellee.

Before DUNIWAY and WALLACE, Circuit Judges, and JAMESON,* District Judge.

DUNIWAY, Circuit Judge:

These are 82 appeals by people convicted, under the second paragraph of 18 U.S.C. § 1382, of unlawfully reentering a naval installation after being ordered not to reenter. We affirm in all appeals.

## I. The Facts

The appeals arise out of protests against the Trident missile system at the Naval Submarine Base in Bangor, Washington (the Base), on May 22 and 23, 1978.[1] Early on May 22, following a night-long candle-light vigil, a large number of demonstrators began assembling outside the perimeter fence at the Base. At approximately 6:30 a. m., the demonstrators congregated in the area of Gate 1 which was marked "Government Property, No Trespassing." One-half hour later, they began climbing the perimeter fence and thus entering the Base. No attempt was made to keep the demonstrators from climbing the fence and entering the Base, even though there were a number of Base security police in the area.[2]

Once inside the Base, the demonstrators moved to a grassy knoll, a few hundred feet from the fence. After they reached the knoll, they were taken into custody by the Base security police, placed on Navy buses and transported to a processing location on the Base. There, each demonstrator was photographed, and certain identification information was obtained from each demonstrator and recorded on an Apprehension Data Card, to which the photograph of the demonstrator was attached. A separate letter was then prepared, addressed to each person in custody. Each letter was signed by the Base commanding officer, and ordered the addressee not to reenter the Base without prior authorization. Copies of the "bar letter" were made and the appropriate letter was served on each of the individual demonstrators. The individual to whom the letter was addressed was located by Base personnel with the aid of the Apprehension Data Cards and attached photos. At the time of service, each person was given an opportunity to acknowledge, in writing, receipt of the letter. If the individual would not sign, the person attempting to serve the

---

\* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. These and other protests at the Base have resulted in other criminal cases before this court. *See United States v. Patz*, 9 Cir., 1978, 584 F.2d 927; *United States v. Douglass*, 9 Cir., 1978, 579 F.2d 545; *United States v. Crow*, 9 Cir., 1977, No. 77–1332 (unpublished Memorandum); *United States v. Garrick*, 9 Cir., No.

78–1810 (order entered Jan. 10, 1979); *United States v. Watson*, 9 Cir., No. 78–2495 (order entered Jan. 10, 1979); *United States v. Kaga*, 9 Cir., No. 78–2012 (order entered Jan. 10, 1979).

2. The Pan American Security Police force is under contract with the United States Navy to provide security at the Base. The police force is part of the Aerospace Services Division of Pan American World Airways.

letter would tell the individual the contents of the letter, initial the original, possibly adding "refused" or "refused to sign" and would attempt to give the individual a copy of the letter. No entry was made in the records indicating whether the copy was accepted or rejected. Each person charged in this case was served with a bar letter on May 22 or 23, 1978, or before.

After the processing, all of the demonstrators were taken to Tacoma. Of the 292 demonstrators apprehended on May 22, all but five were released in Tacoma without being charged. Those five[3] had, according to Base records, previously received bar letters on July 5, 1977. These defendants were transferred to the United Sates Marshal in Tacoma and photographed and fingerprinted, in preparation for their appearance before the magistrate.

The following day, May 23, 1978, a large group of demonstrators again assembled at the perimeter fence of the Base. At approximately 1:30 p. m., the demonstrators climbed the fence and again proceeded to the grassy knoll. There, the security police took 261 demonstrators into custody. This time, the demonstrators were taken to the United States Marshal's offices in either Seattle or Tacoma, where each person was fingerprinted by the U.S. Marshal's office and Apprehension Data Cards with photos were completed by Base security police and other Base personnel.

On May 22, 1978, an Information was filed in the United States District Court for the Western District of Washington charging the five defendants in C.R. 78–148V with a violation of Title 18, United States Code, Section 1382, unlawfully reentering a naval installation.[4] On May 23, 1978, a second Information was filed which charged 107 defendants in C.R. 78–153V with the same violation. On May 24, 1978, a third Information similarly charged 69 defendants in C.R. 78–155V.

The three cases were consolidated for a non jury trial beginning December 26, 1978. All but six of the defendants were found guilty of violating § 1382. The five defendants in C.R. 78–148V were sentenced to forty-five days confinement. All other defendants convicted were given a forty-five day suspended sentence and three years' probation. The custodial sentences were stayed pending appeal, and the defendants were permitted to remain at liberty on their own recognizance. A motion to stay the probationary sentences was denied.

Because of the number of defendants and attorneys involved, at trial and on appeal, and the desire of certain defendants to assure that certain issues are decided by the trial and appellate courts, the arguments raised by the individual defendants on appeal vary. Some defendants have waived their rights to make certain arguments and some arguments are not'applicable to all defendants. With respect to each argument on appeal we will state which appellants are making the argument, or which are not entitled to make it, or have waived it.

## II. *Right to a Grand Jury Indictment and a Jury Trial.*

### A. *Indictment.*

Some of the defendants moved to dismiss the Informations on the ground that, because of their age, they were subject to punishment under the Youth Corrections Act, 18 U.S.C. §§ 5010 and 5017(c) or 4216, which could result in confinement in excess of one year.[5]

---

**3.** The five people held, Jack Rubenstein, John H. Affolter, Louis Ladenburger, Julienne Jesse May and David Garrick, became the defendants in case No. C.R. 78–148V.

**4.** The second paragraph of 18 U.S.C. § 1382 provides in pertinent part:

 . . . Whoever reenters or is found within any [military, naval or Coast Guard] reservation, post, fort, arsenal, yard, station or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—
 Shall be fined not more than $500 or imprisoned not more than six months, or both.

**5.** Those who did so are: Bickelhaupt, John; Comery, John; Delaney, David; Dietzel, Michael; Flavin, Elizabeth; Gale, Howard; Hatten, John; Jordan, Matthew; Litman, Todd; Marshall, Neil; Miller, Fred; McDonald, Anne; Nogler, Thomas; Read, M. Denise; Riddels, Doug.

The indictment clause of the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." *Ex parte Wilson*, 1885, 114 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89 held that an indictment is required whenever an accused may be subjected to an "infamous punishment" if convicted. The potential punishment, not that actually imposed, is determinative. (p. 426, 5 S.Ct. p. 939). The holding was "that a crime punishable by imprisonment for a term of years at hard labor is an infamous crime, within the meaning of the Fifth Amendment. . . ." (p. 429, 5 S.Ct. at p. 941). In *Mackin v. United States*, 1886, 117 U.S. 348, 6 S.Ct. 777, 29 L.Ed. 909, the Court followed *Wilson* and held that " 'Infamous crimes' are . . . those 'punishable by imprisonment in the penitentiary.' " (p. 354, 6 S.Ct. at p. 780). In so holding, the Court cited the Act of June 17, 1870, 16 Stat. 153, which described as "not deemed . . . infamous . . . simple assaults and batteries and all other misdemeanors not punishable by imprisonment in the penitentiary" as a correct construction of the Fifth Amendment. (p. 354, 6 S.Ct. at p. 780).

■ The Congress has continued to define non-infamous crimes in those terms. Section 4083 of 18 U.S.C. provides that "A sentence for an offense punishable by imprisonment for one year or less shall not be served in a penitentiary without the consent of the defendant." And Rule 7(a), F.R.Crim.P. permits prosecution of such offenses by information. It follows that a statute providing for a possible sentence of six months or less cannot result in penitentiary commitment and thus the punishment is not "infamous." Section 1382 of 18 U.S.C. provides for imprisonment not exceeding six months. Thus, a charge of violating that section is not a charge of an offense carrying an "infamous punishment," and therefore need not be made by indictment.

It is argued, however, that for those subject to the Youth Corrections Act, indictment is required because that act would permit the court to incarcerate the defendant for more than six months. *See* 18 U.S.C. § 5010(b) and 4216. However, the Youth Corrections Act does not require that the court impose sentence under that act. The court need not do so if it finds that the youth offender will not benefit from treatment under the Act, 18 U.S.C. § 5011(d).

In these cases the district court, before trial, made the following order:

2. In light of the fact that the defendants in these consolidated actions are charged with an offense, the maximum statutory punishment for which is six months in jail, the Court finds that it would be inequitable to sentence any of the defendants to confinement under the Youth Corrections Act because that confinement might be greatly in excess of six months.

3. This Court will not, therefore, sentence any defendant, if convicted, to confinement under the Federal Youth Corrections Act in order to be sure that each defendant will, if sentenced to confinement, be confined for no longer than six months.

■ The appellants argue that the order deprived them of the benefits of the Youth Corrections Act in a manner proscribed by *Dorszynski v. United States*, 1974, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855. They are wrong. *Dorszynski* considered the findings that a district judge must make in determining that an offender would not benefit from the Act. The Court recognized that the Act was intended to expand, not limit, the sentencing options available to a judge, and thus to broaden his discretion. *Id.* at 436–437, 94 S.Ct. at 3049. However, when a sentence under the Act is eschewed, the judge must make it clear that he has considered the option of treatment under the Act. *Id.* at 443, 94 S.Ct. at 3052. The judge did so here. The order is valid.

■ A person facing a potential penalty in excess of six months confinement has a constitutional right to a jury trial. *Duncan v. Louisiana*, 1968, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491; *Cheff v. Schnackenberg*, 1966, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629. As we have seen, the right not to be put on trial without an indictment also attaches where the potential penalty exceeds one year. Yet in *Taylor v. Hayes*, 1974, 418 U.S. 488, 496, 94 S.Ct. 2697, 2702, 41 L.Ed.2d 897, the Court held that where, after trial for contempt, without a jury, and imposition of a sentence exceeding six months, the court reduced the sentence to six months, the requirement of a jury trial was validly obviated. Similarly, in *United States v. Marthaler*, 9 Cir., 1978, 571 F.2d 1104, 1105, where the charge was criminal contempt, we held that a pre-trial stipulation that the court would not impose a sentence in excess of six months in jail made a jury trial unnecessary, and that the defendant was not entitled to indictment. Under the principles of those cases, the trial judge's order in this case, which limited the potential punishment to the six months pre-

scribed by 18 U.S.C. § 1382, obviated the requirement of an indictment. The defendants were properly charged by information rather than indictment.[6]

### B. Jury Trial.

■ Relying on the argument above that the Youth Corrections Act allowed a possible sentence in excess of six months, some of the defendants demanded a jury trial.[7] In its order, the court also denied the defendants' motions for jury trial. Because the order assured that the maximum potential sentence would be six months, denial of jury trial was correct.

### III. Sufficiency of Bar Letter to Preclude Reentry.

The district court denied a motion to dismiss the Informations on the ground that the bar letters presented to each defendant were invalid as a matter of law,[8] saying that there was no indication in the record of "whether there was in effect any regulation which made illegal defendants' entry upon the base."[9] The government was given an opportunity to produce such a regulation

6. Because of the district court's pretrial ruling limiting the potential sentences, we need not consider the question of whether the possibility of sentencing to "treatment" under the Act requires charge by indictment or trial by jury if the maximum sentence for the underlying offense being prosecuted would not. *See United States v. Ramirez*, 9 Cir., 1976, 556 F.2d 909; *United States v. Indian Boy X*, 9 Cir., 1977, 565 F.2d 585, 596. *Compare Harvin v. United States*, D.C.Cir., 1971, 445 F.2d 675, 677–682 *(in banc) with United States v. Reef*, D.Colo., 1967, 268 F.Supp. 1015 *and Harvin v. United States, supra*, at 692–698 (dissenting opinion of Tamm, J.). *See, also, United States v. Neve*, W.D.Wis., 357 F.Supp. 1, *aff'd*, 7 Cir., 1974, 492 F.2d 465.

7. The appellants who requested jury trial are: Anderson, Michael; Bickelhaupt, John; Block, Debra; Chawes, Richard; Christensen, Jeffrey; Clark, Randall; Colm, John; Comery, John; Cook, John; Delaney, David; Durham, Dana; Ewing, Mitchell; Fitch, Paul; Flavin, Elizabeth; Granlund, James; Hatten, John; Head, Tim; Hunter, Royal; Jordan, Matthew; Latham, Paul; Litman, Todd; McDonald, Anne; Marshall, Neil; Marymoon, Trisha; Miller, Fred; Nogler, Thomas; Peabody, Barbara; Pearson, Cydney; Phipps, Bill; Quinsey, Michael; Read, M. Denise; Riddels, Doug; Runnings, Gywn-

eth; Ryweck, Randy, Sawyer, John; Siegel, Robert; Stahl, Michael; Stewart, Doug; Waddington, Matthew; Wimberger, Jake.

8. The following appellants waived this issue at trial and may not assert it here: Beadle, Deborah; Bickelhaupt, John; Block, Debra; Bowran, Julian; Chawes, Richard; Cole, Pat; Colm, John; Darst, Hal; Ewing, Mitchell; Harrop, Gregory; Head, Tim; Hughes, Fred; Macrae, Ian; Marymoon, Trisha; Peabody, Barbara; Lowe, Justina; Read, M. Denise; Ring, Jennifer; Runnings, Gwyneth; Runnings, John; Sawyer, John; Wilson, Stephen.

9. 32 C.F.R. § 765.4 described the limitations on access to property under the control of the United States Navy:

Access to any naval activity afloat or ashore is subject to (a) the authorization and control of the officer or person in command or charge and (b) restrictions prescribed by law or cognizant authority to safeguard (1) the maximum effectiveness of the activity, (2) classified information . . . (3) national defense or security, and (4) the person and property of visitors as well as members of the Department of Defense, and Government property.

but none was advanced. A regulation was promulgated sometime later on June 5, 1979. *See* 44 Fed.Reg. 32, 368–32,369.[10]

■ The commanding officer of a military base has wide discretion as to whom he will exclude from the base, which will be disturbed only upon a showing that the grounds for exclusion were patently arbitrary or discriminatory. *Cafeteria & Restaurant Workers v. McElroy*, 1961, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230. The scope of review of this court is extremely limited. *Bridges v. Davis*, 9 Cir., 1971, 443 F.2d 970.

We have recently upheld a commanding officer's right "to exclude, even peaceful speech and assembly which interferes in any way with the functioning of [a military base]," by use of a bar letter similar to that used here. *United States v. Douglass*, 9 Cir., 1978, 579 F.2d 545, 549. The conduct involved in that case was disruptive, but noncriminal, as was the conduct involved here. Here, the activities of the demonstrators required the standby presence of 400 Navy and Marine Corps personnel assigned to prevent destruction of government property and required the closure of the main gate through which part of the work force would normally enter the base.

■ Although the base commander relied on an assumption that the demonstrators' initial entry on the base was illegal, he need not have. Regardless of the precise wording of the bar letters involved here, the appellants who received those letters had adequate knowledge that their reentry of the Base was prohibited, and the district judge did not err in denying the motion to dismiss based on the letters.

Appellants' reliance on *United States v. Mowat*, 9 Cir., 1978, 582 F.2d 1194, is misplaced. Although Judge Cummings, writing the opinion, did state that regulations governing entry into a military post, if they constitute "substantive rules of general application" must comply with the Administrative Procedure Act, Judges Merrill and Sneed declined to reach that question. The court was unanimous in holding that the appellants in *Mowat* were aware of the regulations barring their entry and that therefore their convictions were valid even assuming that the government failed to comply with the Administrative Procedure Act in promulgating the regulations. Here also, the appellants who received the bar letter had actual knowledge that they were barred from future entry on the Base. *Mowat* supports our decision in this case.

### IV. *Admission of Photographs and Apprehension Data Cards Prepared by Base Personnel.*

The defendants were charged with illegally reentering the Base. In order to prove a defendant's guilt, the prosecution had to show that the defendant was served with a bar letter or was apprised of its contents and subsequently reentered the Base without express permission. Except for some individuals who waived the issue,[11] the defense challenged at trial the admissibility and sufficiency of the government's proof of these elements of the offense charged. The government's evidence was admitted and the challenge is repeated here.

The defendants objected to the introduction of the Apprehension Data Cards prepared on May 22 at the Base to aid in distribution and recording the receipt of the bar letters. Although the cards have spaces to record the arresting officer, time of arrest, date and location of incident and information identifying the arrester, many of these details were neglected with standard entries made in all categories except identi-

10. In *United States v. Patz*, 9 Cir., 1978, 584 F.2d 927, we held that, absent a bar letter, entry onto the base was not a violation of § 1382. Thus the initial entry was noncriminal.

11. The appellants who expressly waived this issue are: Beadle, Deborah; Bickelhaupt, John; Block, Debra; Bowran, Julian; Cole, Pat; Colm, John; Darst, Hal; Ewing, Mitchell; Harrop, Gregory; Head, Tim; Hughes, Fred; Lowe, Justina; Macrae, Ian; Marymoon, Trisha; Nogler, Thomas; Peabody, Barbara; Read, M. Denise; Reiff, Peggy; Ring, Jennifer; Runnings, Gwyneth; Runnings, John; Sawyer, John; Wilson, Stephen; Wimberger, Jake.

fication. The defendants also objected to the admission of Apprehension Data Cards prepared on May 23 by Base personnel in the U.S. Marshal's offices in Seattle and Tacoma. The defendants claim both that the May 22 Apprehension Data Cards were so incomplete as to be insufficient to equate the identity of the defendants with those persons who received a bar letter and subsequently reentered the Base, and then even were such cards along with the May 23 Apprehension Data Cards sufficient to show such identity, they should not have been admitted at trial because they are hearsay evidence coming within no exception to the hearsay rule, Fed.R.Evid. 803.

 The trial judge held that the Apprehension Data Cards were not hearsay. The Apprehension Data Cards had three components: information detailing the apprehension, information describing the person, including a name, and a photograph of the person described. With respect to the photographs this finding is clearly correct because a photograph is not an assertion, oral, written, or non verbal, as required by Fed.R.Evid. 801(a). Photographs are admissible as substantive as well as illustrative evidence. *See, e. g., United States v. Stearns*, 9 Cir., 1977, 550 F.2d 1167, 1171. *See, also, United States v. Oaxaca*, 9 Cir., 1978, 569 F.2d 518, 524–525. The admission of photographic evidence is largely a matter of discretion for the trial judge. *See United States v. Stearns, supra; United States v. Taylor*, 5 Cir., 1976, 530 F.2d 639, 642. There was no abuse of discretion here. Adequate foundation was presented detailing when and where the photographs were taken and the chain of possession from the time of their taking until their introduction at trial.

 While the written contents of the Apprehension Data Cards could be hearsay if admitted for certain purposes, such as to show that the defendants trespassed on the Base on May 22, or to show that the individual photographed gave a certain name as the cards prepared that day stated, they were not hearsay in this case because they were not "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). *See United States v. James*, 9 Cir., 1978, 576 F.2d 223, 229; *United States v. Oaxaca, supra*, 569 F.2d at 524–525. In receiving this evidence, the judge said that he was not admitting them for the truth of the matter asserted in them (V Tr. p. 450), and that he was admitting the names as circumstantial evidence (V Tr. p. 454). As to the photographs, this was clearly correct. As the prosecutor remarked when offering them, "A comparison of [these] photographs convicts that individual, regardless of what name appears."

There was ample testimony by the persons who made the photographs and the cards that the persons photographed were on the Base on May 22 and 23, that each was served with a bar letter on May 22, and that each was taken from the Base on May 23 and photographed in either Tacoma or Seattle. The witnesses so testifying were of course available for confrontation and cross-examination. None of this was hearsay.

 It remained only to connect the photographs with the persons charged in the Informations. The names on the cards provided that nexus.[12] We do not think that the name is hearsay. In a sense, it is. We can know a person's name only by being told, either by the person or someone else, unless, of course, we happen to have christened the person. But a name, however learned, is not really testimonial. Rather, it is a bit of circumstantial evidence. *United States v. Snow*, 9 Cir., 1975, 517 F.2d 441, 443–444; *United States v. Campbell*, 9 Cir., 1972, 466 F.2d 529, 531; *Bayless v. United States*, 9 Cir., 1967, 381 F.2d 67, 74.

12. The judge could also compare the photographs with the defendants who were before him, and ask their names. Doing so would not have violated their Fifth Amendment rights. *California v. Byers*, 1971, 402 U.S. 424, 432–434, 91 S.Ct. 1535, 1539–1541, 29 L.Ed.2d 9; *United States v. Leal*, 9 Cir., 1972, 460 F.2d 385, 389. However, the record does not indicate that the judge did this in any organized way. Moreover, in these misdemeanor cases, many of the defendants did not appear in person, but only by counsel.

In *Snow*, a name tape carrying the defendant's name, and affixed to a brief case containing a gun, was held to be circumstantial evidence that the defendant knowingly possessed the gun. There was proof that the brief case was found on premises frequently visited by the defendant, but no proof that the defendant had placed the tape on the case or caused it to be placed there. In *Campbell*, a receipt, in defendant's name, for a purchase of a gun, found in a car used in a smuggling operation, was received as evidence connecting the defendant with the smuggling. There was no proof as to how the receipt came to be in the car. In *Bayless*, prison records, in the defendant's name, were received to prove that he had been lawfully held in the prison from which it was charged that he had escaped.

 In the case now before us, there was direct proof that, in the case of each defendant, the name on the card was obtained directly from the person whose picture was attached to the card, by that person's either stating the name, or producing some identification containing the name, or both. This is the usual way in which a person's name is obtained. The record here contains a stronger foundation for the admission of the names than exited in either *Snow* or *Campbell*, and one at least as strong as that in *Bayless*. And if any defendant gave a fictitious name, nothing in the law prevents a prosecution of that defendant under that name.[13]

We find it significant that no appealing defendant asserts that he or she did not climb over the fence on May 22, did not receive a bar letter, or did not again climb over the fence on May 23. See *Bayless, supra*, 381 F.2d at 74 (identity of name is sufficient to identify the person, absent contradictory evidence). *Accord: Chung Young Chew v. Boyd*, 9 Cir., 1962, 309 F.2d 857, 867.

 Defendants were not deprived of their rights of confrontation by the introduction of the photographs and Apprehension Data Cards. The United States called witnesses who testified as to the photographing, preparation of Apprehension Data Cards and service of bar letters on May 22 and 23 and were, of course, subject to cross-examination. As the Court said in *Dutton v. Evans*, 1970, 400 U.S. 74, 88, 91 S.Ct. 210, 219, 27 L.Ed.2d 213:

> From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard. (footnote omitted.)

*See, also, Warren v. United States*, 9 Cir., 1971, 447 F.2d 259, 261–262.

The photographs and cards were properly admitted. We need not, and do not, decide whether they might also have been admissible under Fed.R.Evid. 803(6) or (8).

### V. *Necessity and International Law Defenses.*

All defendants presented below, and argue here, the affirmative defenses of necessity and justification based on international law. They argue that the Trident system is a harm that exceeds in magnitude that of the illegal reentry with which they were charged and that by illegally reentering the Base they were preventing an imminent harm which no available options could similarly prevent. They also argue that the construction and deployment of the Trident constitutes preparation for aggressive warfare in contravention of international legal principles, thus justifying their actions.

 The trial judge found that the defendants had failed to satisfy all of the elements of the necessity defense citing *United States v. Simpson*, 9 Cir., 1972, 460 F.2d 515, 517–518, because there was no reasonable belief that a direct consequence of their actions would be the termination of the Trident program. The judge was obviously right. *United States v. Mowat*, 9 Cir., 1978, 582 F.2d 1194, 1208.

---

13. *Cf. United States v. Ginny Crow and Tom A. Schmoe*, our Nos. 77–1332 and 77–1333 (un-published Memorandum).

As with the defense of necessity, so also with the defense of violation of international law and treaties. The connection between what the defendants did and their claims that the Trident system is designed solely for the waging of aggressive war, and is therefore illegal, is so tenuous as not to give them any basis for asserting the defense. They can assert no harm to themselves from the allegedly illegal conduct of the government that is greater than, or different from, the potential harm that might affect every other person in the United States.

We do not sit to render judgments upon the legality of the conduct of the government at the request of any person who asks us to because he happens to think that what the government is doing is wrong. He must be able to show some direct harm to himself, not a theoretical future harm to all of us that may or may not occur. To consider defendants' argument would put us in the position of usurping the functions that the Constitution has given to the Congress and to the President. See Article I, Section 8, clauses 11, 12, 13, 14, 15, 16, 17, 18; Article II, Section 2, clauses 1, 2. *Schlesinger v. Reservists Committee to Stop the War*, 1974, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706:

> The only interest all citizens share in the claim advanced by respondents is one which presents injury in the abstract. Respondents seek to have the Judicial Branch compel the Executive Branch to act in conformity with the Incompatibility Clause, an interest shared by all citizens. The very language of respondents' complaint, *supra*, at 212 [94 S.Ct. at 2928], reveals that it is nothing more than a matter of speculation whether the claimed nonobservance of that clause deprives citizens of the faithful discharge of the legislative duties of Reservist Members of Congress. And that claimed nonobservance, standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury. (p. 217, 94 S.Ct. p. 2930)

> \* \* \* \* \* \*

> "The motion papers disclose no interest upon the part of the petitioner other than that of a citizen and a member of the bar of this Court. That is insufficient. It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislation action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public."

(p. 220, 94 S.Ct. p. 2931, quoting from *Ex parte Levitt*, 1937, 302 U.S. 633 at 634, 58 S.Ct. 1, at 1, 82 L.Ed. 493)

\* \* \* \* \* \*

> Moreover, when a court is asked to undertake constitutional adjudication, the most important and delicate of its responsibilities, the requirement of concrete injury further serves the function of insuring that such adjudication does not take place unnecessarily.

(p. 221, 94 S.Ct. p. 2932)

\* \* \* \* \* \*

> To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing "government by injunction."

(p. 222, 94 S.Ct. pp. 2932, 2933) (footnotes omitted)

In *Schlesinger v. Reservists Committee and Ex parte Levitt*, the plaintiffs were seeking to maintain actions as "private attorneys general," attacking governmental programs or laws. In the case before us, the defendants seek to mount a similar attack through the back door, by using it as a defense to a charge that they deliberately brought on themselves, one that bears no genuine relationship to the government program that they seek to attack. The approach is differ-

ent, but the result must be the same. The defendants deliberately flouted a valid law—a law that would be equally valid if there were no Trident system. They must take the consequences.

### VI. *Appellant Harris' Claims.*

 Before trial, appellant Julie Harris moved for the disclosure of specified documents relating to the targeting plans of strategic weapons and contamination from nuclear submarines. The trial court denied the motion. What we have just said supports the denial. The evidence sought related to an irrelevant matter.

 Ms. Harris also argues on appeal that the evidence was insufficient to support her conviction. The evidence was sufficient.

The judgments are affirmed.