**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gregory D. SCHOON, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Raymond K. KENNON, Jr., Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Patricia MANNING, Defendant–Appellant.**

**Nos. 90–10167, 90–10210 and 90–10250.**

United States Court of Appeals, Ninth Circuit.

Submitted May 13, 1991.*

Decided July 29, 1991.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Fredric F. Kay, Federal Public Defender, Harriette Levitt, Tucson, Ariz. for defendants-appellants.

Roger L. Duncan, Asst. U.S. Atty., Tucson, Ariz. for plaintiff-appellee.

Before FARRIS, BOOCHEVER and FERNANDEZ, Circuit Judges.

BOOCHEVER, Circuit Judge:

Gregory Schoon, Raymond Kennon, Jr., and Patricia Manning appeal their convictions for obstructing activities of the Internal Revenue Service Office in Tucson, Arizona, and failing to comply with an order of a federal police officer. Both charges stem from their activities in protest of United States involvement in El Salvador. They claim the district court improperly denied them a necessity defense. Because we hold the necessity defense inapplicable in cases like this, we affirm.

## I.

On December 4, 1989, thirty people, including appellants, gained admittance to the IRS office in Tucson, where they chanted "keep America's tax dollars out of El Salvador," splashed simulated blood on the counters, walls, and carpeting, and generally obstructed the office's operation. After a federal police officer ordered the group, on several occasions, to disperse or face arrest, appellants were arrested.

At a bench trial, appellants proffered testimony about conditions in El Salvador as the motivation for their conduct. They attempted to assert a necessity defense, essentially contending that their acts in protest of American involvement in El Salvador were necessary to avoid further bloodshed in that country. While finding appellants motivated solely by humanitarian concerns, the court nonetheless precluded the defense as a matter of law, relying on Ninth Circuit precedent. The sole issue on appeal is the propriety of the court's exclusion of a necessity defense as a matter of law.

## II.

A district court may preclude a necessity defense where "the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense." *United States v. Dorrell*, 758 F.2d 427, 430 (9th Cir.1985). To invoke the necessity defense, therefore, the defendants colorably must have shown that: (1) they were faced with a choice of evils and chose the lesser evil; (2) they acted to prevent imminent harm; (3) they reasonably anticipated a direct causal relationship between their conduct and the harm to be averted; and (4) they had no legal alternatives to violating the law. *United States v. Aguilar*, 883 F.2d 662, 693 (9th Cir.1989), *cert. denied,* — U.S. —, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991). We review *de novo* the district court's decision to bar a necessity defense. *Id.* at 692.

The district court denied the necessity defense on the grounds that (1) the requisite immediacy was lacking; (2) the actions taken would not abate the evil; and (3) other legal alternatives existed. Because the threshold test for admissibility of a necessity defense is a conjunctive one, a court may preclude invocation of the defense if "proof is deficient with regard to any of the four elements...." *Id.* at 693.

■ While we could affirm substantially on those grounds relied upon by the district court, we find a deeper, systemic reason for the complete absence of federal case law recognizing a necessity defense in an indirect civil disobedience case. Indirect civil disobedience involves violating a law which is not, itself, the object of protest, whereas direct civil disobedience involves protesting the existence of a particular law by breaking that law. *See* Note, *Applying the Necessity Defense to Civil Disobedience Cases,* 64 N.Y.U. L. Rev. 79, 79–80 & n. 5 (1989). This case involves indirect civil disobedience because these protestors were not challenging the laws under which they were charged. In contrast, the civil rights lunch counter sit-ins, for example, constituted direct civil disobedience because the protestors were challenging the rule that prevented them from sitting at lunch counters.

■ While our prior cases consistently have found the elements of the necessity defense lacking in cases involving indirect civil disobedience, *see, e.g., Dorrell,* 758 F.2d at 431–34; *United States v. Lowe,* 654 F.2d 562, 567 (9th Cir.1981); *United States v. May,* 622 F.2d 1000, 1008–10 (9th Cir.), *cert. denied,* 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980), we have never addressed specifically whether the defense is available in cases of indirect civil disobedience. Indeed, some other courts have appeared doubtful. *See, e.g., United States v. Seward,* 687 F.2d 1270, 1276 (10th Cir. 1982) ("[Necessity] is obviously not a defense to charges arising from a typical protest."), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 789, 74 L.Ed.2d 995 (1983); *United States v. Kroncke,* 459 F.2d 697, 701 (8th Cir.1972) ("None of the cases even sug-

gests that the defense of necessity would be permitted where the actor's purpose is to effect a change in governmental policies which, according to the actor, may in turn result in a future saving of lives."). Today, we conclude, for the reasons stated below, that the necessity defense is inapplicable to cases involving indirect civil disobedience.

### III.

Necessity is, essentially, a utilitarian defense. *See* Note, *The State Made Me Do It: The Applicability of the Necessity Defense to Civil Disobedience,* 39 Stan.L.Rev. 1173, 1174 (1987). It therefore justifies criminal acts taken to avert a greater harm, maximizing social welfare by allowing a crime to be committed where the social benefits of the crime outweigh the social costs of failing to commit the crime. *See, e.g., Dorrell,* 758 F.2d at 432 (recognizing that "the policy underlying the necessity defense is the promotion of greater values at the expense of lesser values.") (citation omitted). Pursuant to the defense, prisoners could escape a burning prison, *see, e.g., Baender v. Barnett,* 255 U.S. 224, 226, 41 S.Ct. 271, 272, 65 L.Ed. 597 (1921); a person lost in the woods could steal food from a cabin to survive, *see* Posner, *An Economic Theory of the Criminal Law,* 85 Colum.L.Rev. 1193, 1205 (1985); an embargo could be violated because adverse weather conditions necessitated sale of the cargo at a foreign port, *see The William Gray,* 29 F.Cas. 1300, 1302 (C.C.D.N.Y. 1810)(No. 17,694); a crew could mutiny where their ship was thought to be unseaworthy, *see United States v. Ashton,* 24 F.Cas. 873, 874 (C.C.D. Mass. 1834)(No. 14,-470); and property could be destroyed to prevent the spread of fire, *see, e.g., Surocco v. Geary,* 3 Cal. 69, 74 (1853).

What all the traditional necessity cases have in common is that the commission of the "crime" averted the occurrence of an even greater "harm." In some sense, the necessity defense allows us to act as individual legislatures, amending a particular criminal provision or crafting a one-time exception to it, subject to court review,

when a real legislature would formally do the same under those circumstances. For example, by allowing prisoners who escape a burning jail to claim the justification of necessity, we assume the lawmaker, confronting this problem, would have allowed for an exception to the law proscribing prison escapes.

Because the necessity doctrine is utilitarian, however, strict requirements contain its exercise so as to prevent nonbeneficial criminal conduct. For example, " '[i]f the criminal act cannot abate the threatened harm, society receives no benefit from the criminal conduct.' " *Applying the Necessity Defense*, 64 N.Y.U.L.Rev. at 102 (quoting *United States v. Gant*, 691 F.2d 1159, 1164 (5th Cir.1982)). Similarly, to forgive a crime taken to avert a lesser harm would fail to maximize social utility. The cost of the crime would outweigh the harm averted by its commission. Likewise, criminal acts cannot be condoned to thwart threats, yet to be imminent, or those for which there are legal alternatives to abate the harm.

Analysis of three of the necessity defense's four elements leads us to the conclusion that necessity can never be proved in a case of indirect civil disobedience. We do not rely upon the imminent harm prong of the defense because we believe there can be indirect civil disobedience cases in which the protested harm is imminent.

### A.

#### 1. Balance of Harms

■ It is axiomatic that, if the thing to be averted is not a harm at all, the balance of harms necessarily would disfavor any criminal action. Thus, if an insane person bombed a welfare office for "helping those who won't help themselves," that person should be prevented from claiming necessity because the operation of a welfare system is simply not a cognizable harm. Welfare cannot constitute a harm where society has expressed its preference for such a system. *See* Comment, *Political Protest and the Illinois Defense of Necessity*, 54 U.Chi.L.Rev. 1070, 1083 (1987) ("In a society based on democratic decision making, this is how values are ranked—a protester cannot simply assert that her view of what is best should trump the decision of the majority of elected representatives."); *Dorrell*, 758 F.2d at 432 ("[T]he law should [not] excuse criminal activity intended to express the protestor's disagreement with positions reached by the law-making branches of the government."); *People v. Stiso*, 93 Ill.App.3d 101, 48 Ill.Dec. 687, 689, 416 N.E.2d 1209, 1211 (1981) (Necessity, as a matter of law, does not justify barring of access to rooms where abortions performed because "the alleged injury sought to be avoided, the abortions, was not a legally recognized injury."). The law could not function were people allowed to rely on their *subjective* judgments in determining which harms justified the taking of criminal action. *See, e.g., Applying the Necessity Defense*, 64 N.Y.U.L.Rev. at 85 ("An inquiry limited to a defendant's subjective belief fails to make ... an evaluation [of the quality and wisdom of his voluntary choice]. It is for this reason that defendants raising a justification defense are held to a reasonable belief standard.").

■ Just as welfare was not a cognizable harm in our hypothetical, the El Salvador policy has been chosen by society and, therefore, cannot be deemed a cognizable harm here. *See* Levitin, *Putting the Government on Trial: The Necessity Defense and Social Change*, 33 Wayne L.Rev. 1221, 1254–55 (1987) (conceding that, where Congress has decided an issue and can be held accountable, necessity defense should be unavailable); Tiffany & Anderson, *Legislating the Necessity Defense in Criminal Law*, 52 Den.U.L.Rev. 839, 870 (1975) ("legislature is free to make specific value choices and to have its decision prevail when it does"). The El Salvador policy does not violate the Constitution. Appellants have never suggested as much. There is no evidence that the procedure by which the policy was adopted was in any way improper; nor is there any evidence that appellants were prevented systematically from participating in the democratic processes through which the policy was chosen. *See United States v. Carolene*

*Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938) (implicitly reserving special solicitude for discrete and insular minorities).

■ Under these circumstances, as a matter of law, whenever Congress has decided a matter exclusively within its constitutionally-delineated realm of authority, its decision, be it in the form of policy or law, cannot constitute a cognizable harm. If there is no cognizable harm to prevent, the harm resulting from any criminal action taken to prevent it necessarily outweighs any benefit.

### 2. Causal Relationship Between Criminal Conduct and Harm to be Averted

This inquiry requires a court to judge the likelihood that an alleged harm will be abated by the taking of illegal action. In the sense that the likelihood of abatement is required in the traditional necessity cases, there will never be such likelihood in cases of indirect political protest. In the traditional cases, a prisoner flees a burning cell and averts death, or someone demolishes a home to create a firebreak and prevents the conflagration of an entire community. The nexus between the act undertaken and the result sought is a close one. Ordinarily it is the volitional illegal act alone which, once taken, abates the evil.

In political necessity cases involving indirect civil disobedience against congressional acts, however, the act alone is unlikely to abate the evil precisely because the action is indirect.[1] Here, the IRS obstruction, or the refusal to comply with a federal officer's order, are unlikely to abate the killings in El Salvador, or immediately change Congress's policy; instead, it takes another *volitional* actor not controlled by the protestor to take a further step; Congress must change its mind.

### 3. Legal Alternatives

■ A final reason the necessity defense does not apply to these indirect civil disobedience cases is that legal alternatives will never be deemed exhausted when the harm can be mitigated by congressional action. In *Dorrell*, which involved a protestor's trespass on Vandenburg Air Force Base to protest the MX missile program, we answered Dorrell's claims that legal alternatives, like lobbying Congress, were futile by noting that "he differ[ed] little from many whose passionate beliefs are rejected by the will of the majority legitimately expressed." 758 F.2d at 432. The necessity defense as applied in the traditional context requires that one have no legal *alternative* to the illegal conduct contemplated *that would abate the evil*. For the existence of a legal alternative to preclude the taking of illegal action, it would necessarily have to be one which *would abate the evil*. Thus, a person fleeing a burning jail would not be asked either to perish or wait in his cell because someone might conceivably save him (both legal alternatives) because neither are well-suited to the purpose of avoiding death. In other words, a reasonableness requirement is implied into judging whether legal alternatives exist.

The legal alternatives requirement has been treated differently in the political context, however. *Dorrell* did not inquire into the "likelihood" that petitioning Congress would succeed. It merely assumed that the "possibility" of Congress changing its mind was sufficient. Yet, certainly an inquiry into the efficacy of legal alternatives available to a fleeing prisoner would have been undertaken. Without expressly saying so, *Dorrell* decided that petitioning Congress to change a policy is *always* a legal alternative, regardless of the likelihood of the plea's success.

Reading between the lines in *Dorrell*, it appears we took the reasonable position that, once Dorrell had a chance to convince Congress, the necessity defense became un-

---

1. Obviously, the same may not be true of instances of direct civil disobedience. For example, if the evil to be abated was a particular shipment of weapons to El Salvador and the protestors hijacked the truck or destroyed those weapons, the precise evil would have been abated. Because our case does not involve direct civil disobedience, we do not address the applicability of the necessity defense to such incidents.

available because otherwise he would be granted license to violate the law without the concomitant, and outweighing, benefit that the necessity doctrine envisions. That this is so in every indirect political protest does not change the fact that we failed to measure the reasonableness of the legal alternative of petitioning Congress. The cases involving protest of congressional policy have implicitly decided that, because Congress can change its mind at any time in response to citizen protest, petitioning Congress is always an adequate legal alternative. Thus there is never an absence of legal alternatives in cases where congressional action is the protest's aim.

### B.

As have courts before us, we could assume, as a threshold matter, that the necessity defense is conceivably available in these cases, but find the elements never satisfied. Such a decision, however, does not come without significant costs. First, the failure of the federal courts to hold explicitly that the necessity defense is unavailable in these cases results in district courts expending unnecessary time and energy trying to square defendants' claims with the strict requirements of the doctrine. Second, such an inquiry oftentimes requires the courts to tread into areas constitutionally committed to other branches of government. For example, in *May*, which involved trespass on a naval base to protest American nuclear weapons policy, we noted that, "[t]o consider defendants' argument [that trespassing was justified by the nefariousness of the Trident missile] would put us in the position of usurping the functions that the Constitution has given to the Congress and to the President." *May*, 622 F.2d at 1009; *cf. Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 222, 94 S.Ct. 2925, 2933, 41 L.Ed.2d 706 (1974) (to grant standing to protestors would both risk distortion of "the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction' "). Third, holding out the possibility of the defense's applicability sets a trap for the unwary civil disobedient, rather than permitting the individual to undertake a more realistic cost-benefit analysis before deciding whether to break the law in political protest. Fourth, assuming the applicability of the defense in this context may risk its distortion in traditional cases. Finally, some commentators have suggested that the courts have sabotaged the usually low threshold for getting a defense theory before the jury as a means of keeping the necessity defense from the jury. *See, e.g., Applying the Necessity Defense*, 64 N.Y.U. L.Rev. at 85–89; *The State Made Me Do It*, 39 Stan.L.Rev. at 1178–79.

The real problem here is that litigants are trying to distort to their purposes an age-old common law doctrine meant for a very different set of circumstances. What these cases are really about is gaining notoriety for a cause—the defense allows protestors to get their political grievances discussed in a courtroom. *The State Made Me Do It*, 39 Stan.L.Rev. at 1176. It is precisely this political motive that has left some courts, like the district court in this case, uneasy. *See* March 23, 1990 Order of District Court at 4–5 ("Neither a small non-policy making service office of the IRS nor this Courtroom is the proper venue for deciding political questions."); *May*, 622 F.2d at 1009. Because these attempts to invoke the necessity defense "force the courts to choose among causes they should make legitimate by extending the defense of necessity," *Dorrell*, 758 F.2d at 432, and because the criminal acts, themselves, do not maximize social good, they should be subject to a *per se* rule of exclusion.

Thus, we see the failure of any federal court to recognize a defense of necessity in a case like ours not as coincidental, but rather as the natural consequence of the historic limitation of the doctrine. Indirect protests of congressional policies can never meet all the requirements of the necessity doctrine. Therefore, we hold that the necessity defense is not available in such cases.

### CONCLUSION

Because the necessity defense was not intended as justification for illegal acts tak-

en in indirect political protest, we affirm the district court's refusal to admit evidence of necessity.

AFFIRMED.

FERNANDEZ, Circuit Judge, concurring:

I agree with much of what Judge Boochever says regarding the application of the necessity defense to this type of case.

I do not mean to be captious in questioning whether the necessity defense is grounded on pure utilitarianism,[1] but fundamentally, I am not so sure that this defense of justification should be grounded on utilitarian theory alone rather than on a concept of what is right and proper conduct under the circumstances. *See, e.g.,* G. Fletcher, Rethinking Criminal Law, 759–875 (1978). *Cf.,* J. Thomson, Rights, Restitution and Risk, 78–116 (1986) (some reflections on the trolley problem). At any rate this doubt would not prevent me from joining in Judge Boochever's opinion.

I do, however, feel that the law of this circuit constrains me from saying that the necessity defense is not available in these kinds of cases. That law is canvassed in Judge Boochever's opinion and need not be restated by me. Of course, Judge Boochever is exactly right about the outcome of this case. He is also probably right about the outcome of all other cases of this type in the future. Those who would think to use this defense should first think deeply about what Judge Boochever has written.

Therefore, I concur in the result.

---

**1.** For example, without questioning the defense itself, one might question the utility of permitting a condemned mass murderer to escape from a prison conflagration.