UNITED STATES of America,
Plaintiff,

v.

Raul MAXWELL–ANTHONY,
Defendant.

Criminal No. 00–596(JAF).

United States District Court,
D. Puerto Rico.

July 26, 2000.

Linda Backiel, San Juan, CA, for defendant.

Antonio R. Bazán–González, Att. U.S. Attorney, U.S. Attorney's Office, Dist. of

P.R., Criminal Division, Hato, PR, Guillermo Gil, U.S. Attorney, San Juan, PR, for United States.

### OPINION AND ORDER

FUSTE, District Judge.

Defendant Raúl Maxwell–Anthony ("Maxwell") is charged with unlawfully entering a U.S. Naval installation without prior authorization in violation of 18 U.S.C. § 1382 (1982). Defendant submits an Offer of Proof and moves for permission to present expert testimony relating to his justification defense.

This case does not stand alone. It is one of a multitude of cases already before this court which originate in the alleged criminal trespass of individuals onto the Naval installations in Vieques, Puerto Rico. Accordingly, we fully discuss the issues raised by Defendant's motion both to decide them in this instance, and in anticipation of similar motions in the near future.

### I.

On or about June 13, 2000, Defendant allegedly entered the Camp García Naval Installation in Vieques, Puerto Rico, for the purported purpose of temporarily stopping the United States Navy's use of the facility to conduct military training exercises with, inter alia, submarines equipped with nuclear weapons. He was subsequently charged by Information with violating 18 U.S.C. § 1382,[1] which prohibits, among other things, unlawful entry onto Naval property for any purpose prohibited

by regulation, in this case 32 C.F.R. § 770.38 (2000).[2]

Defendant moves for a court order permitting the introduction of expert testimony regarding an individual's alleged duty under international law to prevent the further deployment of nuclear weapons in Puerto Rico. In short, Defendant argues that: (1) international law, as adopted by the United States, prohibits the deployment of nuclear weapons in Puerto Rico; (2) the Navy deploys nuclear weapons upon its Trident submarines when conducting training exercises in Vieques; (3) his lawful efforts, and those of others, have failed to prevent the continued deployment of nuclear weapons in Puerto Rico; (4) the international war crimes tribunal at Nuremberg after World War II recognized that an individual had an obligation under international law to violate domestic law to prevent his country's continuing crimes against humanity; and (5) his entry without proper authorization onto Camp García was necessary to avoid, what he perceived to be, the greater harm of potential nuclear disaster.

Thus, Defendant reasons that he cannot be prosecuted pursuant to 18 U.S.C. § 1382 because he had a duty under international law to violate domestic law, including 32 C.F.R. § 770.38, to prevent continuing international law violations which the Navy's training exercises allegedly represented. This argument raises the necessity defense and a defense originating in the Nuremberg trials after World War II.

Alternatively, Defendant contends that his Offer of Proof and proposed expert

---

**1.** The section provides, in relevant part, that: "[w]hoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation ... [s]hall be fined under this title or imprisoned not more than six months, or both." 18 U.S.C. § 1382.

**2.** The Regulation provides:

> Except for duly authorized military personnel and civilian employees, including contract employees, of the United States in the performance of their official duties, entry upon any U.S. Navy installation or property in Puerto Rico at anytime, by any person for any purpose whatsoever without the advance consent of the Commanding Officer of the installation or property concerned, or an authorized representative of that Commanding Officer, is prohibited.
> 32 C.F.R. § 770.38.

testimony is admissible as evidence of his reasonable belief that he was acting to prevent the greater harm that constituted the alleged international law violations by the U.S. Navy.

## II.

■ Defendant first proposes the necessity defense. A district court may preclude a necessity defense where "the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense." *United States v. Dorrell,* 758 F.2d 427, 430 (9th Cir.1985) (citations omitted); *see also United States v. Brodhead,* 714 F.Supp. 593, 595 (D.Mass.1989) (finding that several federal circuits have approved district court rulings which preclude the introduction of affirmative defenses at trial). Thus, before presenting evidence at trial, a defendant must demonstrate, by a preponderance of the evidence, that a fact-finder could reasonably find in his favor with regard to each element of the necessity defense. *See United States v. Unser,* 165 F.3d 755, 764 (10th Cir.1999) ("It is well settled, and not challenged here, that the defendant ... must bear the initial burden of producing evidence which could support a finding in his favor on each element of the defense"); *United States v. Aguilar,* 883 F.2d 662, 693 (9th Cir.1989) (finding that test for determining availability of necessity defense is conjunctive).

■ Although the First Circuit has not adopted a particular formulation of the necessity defense, *see United States v. Duclos,* 214 F.3d 27, 33 n. 3 (1st Cir.2000) (refraining from adopting particular formulation of necessity defense), several circuits have found that the defense is applicable if a defendant demonstrates that: (1) he was faced with a choice of evils and choose the lesser one; (2) he acted to prevent imminent harm; (3) he reasonably

anticipated a direct causal relationship between his conduct and the avoidance of the harm; and (4) he had no legal alternative to violating the law. *See United States v. Turner,* 44 F.3d 900, 902 (10th Cir.1995); *United States v. Schoon,* 971 F.2d 193, 195 (9th Cir.1991) (citation omitted); *United States v. Kabat,* 797 F.2d 580, 591 (8th Cir.1986). Thus, Defendant Maxwell may only argue the necessity defense at trial if he demonstrates that entering Camp García was a lesser evil; his presence at the Naval installation prevented an imminent harm; he reasonably anticipated that his presence at the Camp would alter the Navy's policy; *and* that he had no legal alternative to entering the Naval installation without authorization.

■ After a thoughtful review of Defendant's motion and tendered Offer of Proof, we find that he fails to carry his burden with respect to, at least, two of the four prongs of the necessity defense.

## III.

### A. *Choice of Harms*

■ Defendant argues that the Navy's policy of utilizing submarines which can be fitted with nuclear weapons in their training exercises off the coast of Vieques, Puerto Rico, constitutes a grave harm. However, "the mere existence of a constitutional law or governmental policy cannot constitute a legally cognizable harm." *Schoon,* 971 F.2d at 197 (citation omitted). Although a law or policy can result in general harm, an individual lacks standing in such generalized harm. *See United States v. Lowe,* 654 F.2d 562, 566–67 (9th Cir.1981) (citing *United States v. May,* 622 F.2d 1000 (9th Cir.1980), for the proposition that the necessity defense in indirect civil disobedience cases is a "back door" attempt to attack government programs in a manner foreclosed by the standing requirements of the Supreme Court).[3]

---

3. Indirect civil disobedience "involves violating a law or interfering with a government policy that is not, itself, the object of protest.

Direct civil disobedience, on the other hand, involves protesting the existence of a law by breaking that law or by preventing the execu-

Moreover, Defendant has not alleged that the procedure by which the United States Government generally, or Navy specifically, adopted the contested policy was in any way improper; nor any evidence that he or others who are similarly situated were prevented systematically from participating in the democratic processes which indirectly produced the policy. *See Schoon*, 971 F.2d at 198 (citing *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)). Instead, Defendant contends that the mere existence of the Navy's policy regarding Trident submarines in Puerto Rico constitutes a continuing harm.

■ This is simply not enough. This court does not:

> [s]it to render judgments upon the legality of the conduct of the government at the request of any person who asks us to because he happens to think that what the government is doing is wrong. [The litigant] must be able to show some direct harm to himself, not a theoretical future harm to all of us that may or may not occur. To consider defendant's argument would put us in the position of usurping the functions that the Constitution has given to the Congress and to the President.

*May*, 622 F.2d at 1009 (citing U.S. Const. art. I, § 8, clauses 11, 12, 13, 14, 15, 16, 17, 18; U.S. Const. art. II, § 2, clauses 1, 2; *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)).

Thus, since, as a matter of law, the mere existence of the United States' policy regarding Trident submarines in Puerto Rico cannot constitute a legally cognizable harm, Defendant's alleged criminal conduct which was purportedly taken to stop the Navy's training activities in Puerto Rico does not outweigh whatever benefit that may have resulted from such action.

tion of that law in a specific instance in which a particularized harm would otherwise fol-

## B. *Legal Alternative*

■ Defendant argues that he had no legal alternative but to enter Camp García unlawfully so as to prevent the Navy's alleged international law violations and the potential harm to humanity which could result from their training exercises. However, "legal alternatives will never be deemed exhausted when the harm can be mitigated by [political] action." *Schoon*, 971 F.2d at 198; *see also Turner*, 44 F.3d at 902 (noting that availability of reasonable legal alternative precludes necessity defense). If a court were to hold otherwise, it risks sanctioning a defendant's circumvention of democratic, decision-making processes and his rejection of the course of action chosen by elected representatives. *See Kabat*, 797 F.2d at 591–92 (noting that a court which permits the necessity defense to excuse criminal activity makes a negative political or policy judgement about a course of action which was properly chosen by other branches of government); *Dorrell*, 758 F.2d at 432 (finding that defendant's belief "differ[ed] little from many whose passionate beliefs are rejected by the will of the majority legitimately expressed").

Here, the Executive branch reached the decision to renew training activities in Vieques after extended, in-depth, inclusive discussions with interested parties. *See, e.g.,* "Congress Okays $40 Million for Vieques," Caribbean Update, Aug. 1, 2000, *available in* LEXIS, News Library, Allnws File; Francis X. Clines, "Puerto Ricans Gain Ear of Washington But Seek Far More," New York Times, Dec. 5, 1999, *available in* LEXIS, News Library, Allnws File; "Text of Clinton's Vieques Statement," Associated Press, Dec. 4, 1999, *available in* LEXIS, News Library, Allnws File; Chris Hawley, "Puerto Rico Rejects U.S. Plan for Navy Use of Island,"

low." *Schoon*, 971 F.2d at 196.

Associated Press, Dec. 4, 1999, *available in* LEXIS, News Library, Allnws File; "Senator Questions Navy Deployment," AP Online, Oct. 27, 1999, *available in* LEXIS, News Library, Allnws File. The public discourse on the Vieques issue included Congressional testimony by, among many others, Puerto Rico's Governor Pedro Rosselló. *See, e.g.,* "Testimony [on] October 19, 1999[by] Pedro Rosselló, Governor of Puerto Rico [before] Senate Armed Services [Committee, regarding] Future Training at Vieques," October 21, 1999, *available in* LEXIS, News Library, Allnws File. In the end, President Clinton decided, among other things, that the Navy could continue its training operations with inert armaments until the people of Vieques, through a public referendum, ultimately decide the future of the Navy's training exercises. *See, e.g.,* Christopher Marquis, "U.S. Ready to Remove Vieques Protesters," NEW YORK TIMES, May 4, 2000, *available in* LEXIS, News Library, Allnws File.

Thus, we find that Defendant, by participating in the political process, had, and has, a legal alternative to unlawfully entering the Naval installation in Vieques. Consequently, the necessity defense is unavailable to him. *See Lowe,* 654 F.2d at 566–67; *Brodhead,* 714 F.Supp. at 596–97.

## IV.

■ Associated with Defendant's proposed necessity defense is his claim to have acted according to the obligations of international law. Specifically, Defendant argues that the international war crimes tribunal at Nuremberg after World War II recognized a citizen's privilege to violate domestic law in order to prevent continuing international violations by his country. In Defendant's case, he alleges that the United States' continuing deployment of nuclear weapons on its Trident submarines violates international law as codified in various treaties and as crystallized in customary international law.

Federal courts have resoundingly rejected the Nuremberg defense in the context of nuclear weapons protest. *See, e.g., Kabat,* 797 F.2d at 590; *United States v. Montgomery,* 772 F.2d 733, 737–38 (11th Cir.1985); *Brodhead,* 714 F.Supp. at 597–98; *United States v. Best,* 476 F.Supp. 34, 46 (D.Colo.1979) (quoting approvingly *Hawaii v. Marley,* 54 Haw. 450, 509 P.2d 1095 (1973)); *see also United States v. Allen,* 760 F.2d 447, 453 (2d Cir.1985) (rejecting international law defense generally based upon Nuremberg principles); *United States v. May,* 622 F.2d 1000, 1009–1010 (9th Cir.1980) (same).

During the Nuremberg trials, some defendants argued that they should not be prosecuted for enforcing or implementing domestic laws because these laws were valid in those countries. *See Kabat,* 797 F.2d at 590 (citing The Justice Case, *reprinted in* 3 Trials of War Criminals Before Nuremberg Military Tribunals Under Control Council Law No. 10 (1951)). The tribunal rejected this argument, however, holding that the defendants had an obligation to violate domestic law to prevent their country's continuing violations of international law. *See id.* Thus, Defendant Maxwell proposes that he had a duty to violate 18 U.S.C. § 1382 to prevent continuing alleged infractions of international law by the United States and its Navy.

We find Defendant's analogy of his situation to those of the Nuremberg defendants to be faulty. The domestic law of the Nazi regime required the Nuremberg defendants to act in ways that furthered the regime's violations of international principles. *See id.; Montgomery,* 772 F.2d at 738. Consequently, the international tribunal found that:

[t]hose persons had committed war crimes—crimes of commission, not crimes of omission—and any privilege to have violated domestic law would have followed from the need to avoid personal liability under international law. It would be a great extension of this argument to hold that persons who remained

passive, neither aiding nor opposing their governments' international violations, were war criminals merely by virtue of their citizenship or residence in their given countries. And if failure to object does not make one complicit, persons such as the defendants here are in no danger of sanction under international law and can claim no privilege to violate domestic law to protect themselves. *Kabat,* 797 F.2d at 590. Thus, since 18 U.S.C. § 1382 did not require Defendant to act in a way violative of international law, he had no obligation under the Nuremberg principles to violate it.

### V.

■ We find that pursuant to the Rules of Evidence, expert testimony other evidence concerning international law is irrelevant to the issue of whether Defendant knew that he was entering Camp García without authorization on June 13, 2000, regardless of his motivation for doing so. *See* FED. R. EVID. 702–704.

■ Moreover, we reject Defendant's contention that his reasonable belief as to the primacy of international law and the prevention of what he perceived to be its continuing violation justified his action. As a rule, a defendant's mistake or ignorance of the law does not excuse his criminal conduct. *See, e.g., Shevlin–Carpenter Co. v. Minnesota,* 218 U.S. 57, 68, 30 S.Ct. 663, 54 L.Ed. 930 (1910) ("[I]nnocence cannot be asserted of an action which violates existing law, and ignorance of the law will not excuse."). This principle applies equally to a violation of a regulation or a statute. *See United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 563, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). Courts, however, have recognized certain exceptions. *See, e.g., United States v. Meade,* 175 F.3d 215, 225 (1st Cir.1999) (citing *Lambert v. California,* 355 U.S. 225, 228–29, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), for the proposition that actual knowledge of law that criminal-

izes conduct ordinarily not considered criminal is necessary). Since Defendant alleges that he misunderstood the relationship of two bodies of law rather than an ignorance of the regulation prohibiting unlawful entry into the Naval installation, we find that the general proposition of mistake of law applies to him.

### VI.

### *Conclusion*

By unlawfully entering Camp García, Defendant sought to become a private solicitor general, attacking before this court a decision of the Executive branch which had been reached after consultation with Congress and Puerto Rico's political leaders. His present attempt to shield himself from prosecution by invoking the force of international law and the necessity defense is yet another salvo against the U.S. government's policy rather than the validlyenacted regulation for which he faces trial.

We find this form of civil disobedience to be caustic to our Schumpeterian ideals and disruptive of the judicial process. If Defendant is found to have deliberately flouted a valid law, a law that would be equally valid in the absence of Trident submarines in Puerto Rico, he must face the consequences.

In accordance with the foregoing, we **DENY** Defendant's motion to introduce expert testimony regarding international law and **ORDER** that he not argue at trial, nor present any evidence purporting to substantiate, a necessity defense.

**IT IS SO ORDERED.**