UNITED STATES of America,
Plaintiff–Appellee,

v.

Gregory D. SCHOON, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Raymond K. KENNON, Jr.,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Patricia MANNING, Defendant–
Appellant.

Nos. 90–10167, 90–10210 and 90–10250.

United States Court of Appeals,
Ninth Circuit.

Submitted May 13, 1991.*

Decided July 29, 1991.

As Amended Feb. 4, 1992.

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Fredric F. Kay, Federal Public Defender, Harriette Levitt, Tucson, Ariz., for defendants-appellants.

Roger L. Duncan, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before FARRIS, BOOCHEVER and FERNANDEZ, Circuit Judges.

BOOCHEVER, Circuit Judge:

Gregory Schoon, Raymond Kennon, Jr., and Patricia Manning appeal their convictions for obstructing activities of the Internal Revenue Service Office in Tucson, Arizona, and failing to comply with an order of a federal police officer. Both charges stem from their activities in protest of United States involvement in El Salvador. They claim the district court improperly denied them a necessity defense. Because we hold the necessity defense inapplicable in cases like this, we affirm.

## I.

On December 4, 1989, thirty people, including appellants, gained admittance to the IRS office in Tucson, where they chanted "keep America's tax dollars out of El Salvador," splashed simulated blood on the counters, walls, and carpeting, and generally obstructed the office's operation. After a federal police officer ordered the group, on several occasions, to disperse or face arrest, appellants were arrested.

At a bench trial, appellants proffered testimony about conditions in El Salvador as the motivation for their conduct. They attempted to assert a necessity defense, essentially contending that their acts in protest of American involvement in El Salvador were necessary to avoid further bloodshed in that country. While finding appellants motivated solely by humanitarian concerns, the court nonetheless precluded the defense as a matter of law, relying on Ninth Circuit precedent. The sole issue on appeal is the propriety of the court's exclusion of a necessity defense as a matter of law.

## II.

A district court may preclude a necessity defense where "the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense." *United States v. Dorrell,* 758 F.2d 427, 430 (9th Cir.1985). To invoke the necessity defense, therefore, the defendants colorably must have shown that: (1) they were faced with a choice of evils and chose the lesser evil; (2) they acted to prevent imminent harm; (3) they reasonably anticipated a direct causal relationship between their conduct and the

harm to be averted; and (4) they had no legal alternatives to violating the law. *United States v. Aguilar,* 883 F.2d 662, 693 (9th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991). We review *de novo* the district court's decision to bar a necessity defense. *Id.* at 692.

■ The district court denied the necessity defense on the grounds that (1) the requisite immediacy was lacking; (2) the actions taken would not abate the evil; and (3) other legal alternatives existed. Because the threshold test for admissibility of a necessity defense is a conjunctive one, a court may preclude invocation of the defense if "proof is deficient with regard to any of the four elements." *Id.* at 693.

■ While we could affirm substantially on those grounds relied upon by the district court, we find a deeper, systemic reason for the complete absence of federal case law recognizing a necessity defense in an indirect civil disobedience case. As used in this opinion, "civil disobedience" is the wilful violation of a law, undertaken for the purpose of social or political protest. *Cf. Webster's Third New International Dictionary* 413 (unabridged, 1976) ("refusal to obey the demands or commands of the government" to force government concessions). Indirect civil disobedience involves violating a law or interfering with a government policy that is not, itself, the object of protest. Direct civil disobedience, on the other hand, involves protesting the existence of a law by breaking that law or by preventing the execution of that law in a specific instance in which a particularized harm would otherwise follow. *See* Note, *Applying the Necessity Defense to Civil Disobedience Cases,* 64 N.Y.U.L.Rev. 79, 79–80 & n. 5 (1989). This case involves indirect civil disobedience because these protestors were not challenging the laws under which they were charged. In contrast, the civil rights lunch counter sit-ins, for example, constituted direct civil disobedience because the protestors were challenging the rule that prevented them from sitting at lunch counters. Similarly, if a city council passed an ordinance requiring immediate infusion of a suspected carcino-

gen into the drinking water, physically blocking the delivery of the substance would constitute direct civil disobedience: protestors would be preventing the execution of a law in a specific instance in which a particularized harm—contamination of the water supply—would otherwise follow.

■ While our prior cases consistently have found the elements of the necessity defense lacking in cases involving indirect civil disobedience, *see, e.g., Dorrell,* 758 F.2d at 431–34; *United States v. Lowe,* 654 F.2d 562, 567 (9th Cir.1981); *United States v. May,* 622 F.2d 1000, 1008–10 (9th Cir.), *cert. denied,* 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980), we have never addressed specifically whether the defense is available in cases of indirect civil disobedience. Indeed, some other courts have appeared doubtful. *See, e.g., United States v. Seward,* 687 F.2d 1270, 1276 (10th Cir. 1982) ("[Necessity] is obviously not a defense to charges arising from a typical protest."), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 789, 74 L.Ed.2d 995 (1983); *United States v. Kroncke,* 459 F.2d 697, 701 (8th Cir.1972) ("None of the cases even suggests that the defense of necessity would be permitted where the actor's purpose is to effect a change in governmental policies which, according to the actor, may in turn result in a future saving of lives."). Today, we conclude, for the reasons stated below, that the necessity defense is inapplicable to cases involving indirect civil disobedience.

### III.

Necessity is, essentially, a utilitarian defense. *See* Note, *The State Made Me Do It: The Applicability of the Necessity Defense to Civil Disobedience,* 39 Stan.L.Rev. 1173, 1174 (1987). It therefore justifies criminal acts taken to avert a greater harm, maximizing social welfare by allowing a crime to be committed where the social benefits of the crime outweigh the social costs of failing to commit the crime. *See, e.g., Dorrell,* 758 F.2d at 432 (recognizing that "the policy underlying the necessity defense is the promotion of greater values at the expense of lesser values") (cita-

tion omitted). Pursuant to the defense, prisoners could escape a burning prison, *see, e.g., Baender v. Barnett*, 255 U.S. 224, 226, 41 S.Ct. 271, 271–72, 65 L.Ed. 597 (1921); a person lost in the woods could steal food from a cabin to survive, *see* Posner, *An Economic Theory of the Criminal Law*, 85 Colum.L.Rev. 1193, 1205 (1985); an embargo could be violated because adverse weather conditions necessitated sale of the cargo at a foreign port, *see The William Gray*, 29 F.Cas. 1300, 1302 (C.C.D.N.Y. 1810) (No. 17,694); a crew could mutiny where their ship was thought to be unseaworthy, *see United States v. Ashton*, 24 F.Cas. 873, 874 (C.C.D.Mass. 1834) (No. 14,470); and property could be destroyed to prevent the spread of fire, *see, e.g., Surocco v. Geary*, 3 Cal. 69, 74 (1853).

What all the traditional necessity cases have in common is that the commission of the "crime" averted the occurrence of an even greater "harm." In some sense, the necessity defense allows us to act as individual legislators, amending a particular criminal provision or crafting a one-time exception to it, subject to court review, when a real legislature would formally do the same under those circumstances. For example, by allowing prisoners who escape a burning jail to claim the justification of necessity, we assume the lawmaker, confronting this problem, would have allowed for an exception to the law proscribing prison escapes.

Because the necessity doctrine is utilitarian, however, strict requirements contain its exercise so as to prevent non-beneficial criminal conduct. For example, " '[i]f the criminal act cannot abate the threatened harm, society receives no benefit from the criminal conduct.' " *Applying the Necessity Defense*, 64 N.Y.U.L.Rev. at 102 (quoting *United States v. Gant*, 691 F.2d 1159, 1164 (5th Cir.1982)). Similarly, to forgive a crime taken to avert a lesser harm would fail to maximize social utility. The cost of the crime would outweigh the harm averted by its commission. Likewise, criminal acts cannot be condoned to thwart threats, yet to be imminent, or those for which there are legal alternatives to abate the harm.

Analysis of three of the necessity defense's four elements leads us to the conclusion that necessity can never be proved in a case of indirect civil disobedience. We do not rely upon the imminent harm prong of the defense because we believe there can be indirect civil disobedience cases in which the protested harm is imminent.

### A.

#### 1. Balance of Harms

█ It is axiomatic that, if the thing to be averted is not a harm at all, the balance of harms necessarily would disfavor any criminal action. Indirect civil disobedience seeks first and foremost to bring about the repeal of a law or a change of governmental policy, attempting to mobilize public opinion through typically symbolic action. These protestors violate a law, not because it is unconstitutional or otherwise improper, but because doing so calls public attention to their objectives. Thus, the most immediate "harm" this form of protest targets is the *existence* of the law or policy. However, the mere existence of a constitutional law or governmental policy cannot constitute a legally cognizable harm. *See* Comment, *Political Protest and the Illinois Defense of Necessity*, 54 U.Chi.L.Rev. 1070, 1083 (1987) ("In a society based on democratic decision making, this is how values are ranked—a protester cannot simply assert that her view of what is best should trump the decision of the majority of elected representatives."); *cf. Dorrell*, 758 F.2d at 432 ("[T]he law should [not] excuse criminal activity intended to express the protestor's disagreement with positions reached by the lawmaking branches of the government.").

There may be, of course, general harms that result from the targeted law or policy. Such generalized "harm," however, is too insubstantial an injury to be legally cognizable. We have in the past rejected the use of the necessity defense in indirect civil disobedience cases as a " 'back door' attempt to attack government programs in a manner foreclosed by [federal] standing requirement[s]." *United States v. Lowe*, 654

F.2d 562, 566–67 (9th Cir.1981) (citing *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 220–21, 94 S.Ct. 2925, 2931–32, 41 L.Ed.2d 706 (1974) (standing to attack governmental conduct requires direct, concrete injury; abstract injury insufficient)); *see United States v. May,* 622 F.2d 1000, 1009 (9th Cir.) (same), *cert. denied,* 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980). The law could not function were people allowed to rely on their *subjective* beliefs and value judgments in determining which harms justified the taking of criminal action. *See United States v. Moylan,* 417 F.2d 1002, 1008–09 (4th Cir.1969) ("[E]xercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law.... Toleration of such conduct would [be] inevitably anarchic."), *cert. denied,* 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970).

■ The protest in this case was in the form of indirect civil disobedience, aimed at reversal of the government's El Salvador policy. That policy does not violate the Constitution, and appellants have never suggested as much. There is no evidence that the procedure by which the policy was adopted was in any way improper; nor is there any evidence that appellants were prevented systematically from participating in the democratic processes through which the policy was chosen. *See United States v. Carolene Products Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938) (implicitly reserving special solicitude for discrete and insular minorities). The most immediate harm the appellants sought to avert was the existence of the government's El Salvador policy, which is not in itself a legally cognizable harm. Moreover, any harms resulting from the operation of this policy are insufficiently concrete to be legally cognizable as harms for purposes of the necessity defense.

Thus, as a matter of law, the mere existence of a policy or law validly enacted by Congress cannot constitute a cognizable harm. If there is no cognizable harm to prevent, the harm resulting from repeal of the law or policy necessarily outweighs any benefit of the action.

### 2. Causal Relationship Between Criminal Conduct and Harm to be Averted

This inquiry requires a court to judge the likelihood that an alleged harm will be abated by the taking of illegal action. In the sense that the likelihood of abatement is required in the traditional necessity cases, there will never be such likelihood in cases of indirect political protest. In the traditional cases, a prisoner flees a burning cell and averts death, or someone demolishes a home to create a firebreak and prevents the conflagration of an entire community. The nexus between the act undertaken and the result sought is a close one. Ordinarily it is the volitional illegal act alone which, once taken, abates the evil.

■ In political necessity cases involving indirect civil disobedience against congressional acts, however, the act alone is unlikely to abate the evil precisely because the action is indirect. Here, the IRS obstruction, or the refusal to comply with a federal officer's order, are unlikely to abate the killings in El Salvador, or immediately change Congress's policy; instead, it takes another *volitional* actor not controlled by the protestor to take a further step; Congress must change its mind.

### 3. Legal Alternatives

■ A final reason the necessity defense does not apply to these indirect civil disobedience cases is that legal alternatives will never be deemed exhausted when the harm can be mitigated by congressional action. As noted above, the harm indirect civil disobedience aims to prevent is the continued existence of a law or policy. Because congressional action can *always* mitigate this "harm," lawful political activity to spur such action will always be a legal alternative. On the other hand, we cannot say that this legal alternative will always exist in cases of direct civil disobedience, where protestors act to avert a concrete harm flowing from the operation of the targeted law or policy.

The necessity defense requires the absence of any legal alternative to the contemplated illegal conduct which could reasonably be expected to abate an imminent evil. *See United States v. Bailey,* 444 U.S. 394, 410, 100 S.Ct. 624, 634–35, 62 L.Ed.2d 575 (1980) (alternative exists if there is "a chance both to refuse to do the criminal act and also to avoid the threatened harm") (quoting W. LaFave & A. Scott, *Handbook on Criminal Law* 379 (1972)). A prisoner fleeing a burning jail, for example, would not be asked to wait in his cell because someone might conceivably save him; such a legal alternative is ill-suited to avoiding death in a fire. In other words, the law implies a reasonableness requirement in judging whether legal alternatives exist.

Where the targeted harm is the existence of a law or policy, our precedents counsel that this reasonableness requirement is met simply by the possibility of congressional action. For example, in *Dorrell,* an indirect civil disobedience case involving a trespass on Vandenburg Air Force Base to protest the MX missile program, we rejected Dorrell's claims that legal alternatives, like lobbying Congress, were unavailable because they were futile. Dorrell, we said, "differ[ed] little from many whose passionate beliefs are rejected by the will of the majority legitimately expressed." 758 F.2d at 432. We assumed there that the "possibility" that Congress will change its mind is sufficient in the context of the democratic process to make lawful political action a reasonable alternative to indirect civil disobedience. Without expressly saying so, *Dorrell* decided that petitioning Congress to change a policy is *always* a legal alternative in such cases, regardless of the likelihood of the plea's success. Thus, indirect civil disobedience can never meet the necessity defense requirement that there be a lack of legal alternatives.

### B.

As have courts before us, we could assume, as a threshold matter, that the necessity defense is conceivably available in these cases, but find the elements never satisfied. Such a decision, however, does not come without significant costs. First, the failure of the federal courts to hold explicitly that the necessity defense is unavailable in these cases results in district courts expending unnecessary time and energy trying to square defendants' claims with the strict requirements of the doctrine. Second, such an inquiry oftentimes requires the courts to tread into areas constitutionally committed to other branches of government. For example, in *May,* which involved trespass on a naval base to protest American nuclear weapons policy, we noted that, "[t]o consider defendants' argument [that trespassing was justified by the nefariousness of the Trident missile] would put us in the position of usurping the functions that the Constitution has given to the Congress and to the President." *May,* 622 F.2d at 1009; *cf. Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 222, 94 S.Ct. 2925, 2933, 41 L.Ed.2d 706 (1974) (to grant standing to protestors would both risk distortion of "the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction'"). Third, holding out the possibility of the defense's applicability sets a trap for the unwary civil disobedient, rather than permitting the individual to undertake a more realistic cost-benefit analysis before deciding whether to break the law in political protest. Fourth, assuming the applicability of the defense in this context may risk its distortion in traditional cases. Finally, some commentators have suggested that the courts have sabotaged the usually low threshold for getting a defense theory before the jury as a means of keeping the necessity defense from the jury. *See, e.g., Applying the Necessity Defense,* 64 N.Y.U.L.Rev. at 85–89; *The State Made Me Do It,* 39 Stan.L.Rev. at 1178–79.

The real problem here is that litigants are trying to distort to their purposes an age-old common law doctrine meant for a very different set of circumstances. What these cases are really about is gaining notoriety for a cause—the defense allows protestors to get their political grievances discussed in a courtroom. *The State Made*

*Me Do It*, 39 Stan.L.Rev. at 1176. It is precisely this political motive that has left some courts, like the district court in this case, uneasy. *See* March 23, 1990 Order of District Court at 4–5 ("Neither a small non-policy making service office of the IRS nor this Courtroom is the proper venue for deciding political questions."); *May*, 622 F.2d at 1009. Because these attempts to invoke the necessity defense "force the courts to choose among causes they should make legitimate by extending the defense of necessity," *Dorrell*, 758 F.2d at 432, and because the criminal acts, themselves, do not maximize social good, they should be subject to a *per se* rule of exclusion.

Thus, we see the failure of any federal court to recognize a defense of necessity in a case like ours not as coincidental, but rather as the natural consequence of the historic limitation of the doctrine. Indirect protests of congressional policies can never meet all the requirements of the necessity doctrine. Therefore, we hold that the necessity defense is not available in such cases.

## CONCLUSION

Because the necessity defense was not intended as justification for illegal acts taken in indirect political protest, we affirm the district court's refusal to admit evidence of necessity.

AFFIRMED.

FERNANDEZ, Circuit Judge, concurring:

I agree with much of what the majority says regarding the application of the necessity defense to this type of case.

I do not mean to be captious in questioning whether the necessity defense is grounded on pure utilitarianism,[1] but fundamentally, I am not so sure that this defense of justification should be grounded on utilitarian theory alone rather than on a concept of what is right and proper conduct under the circumstances. *See, e.g.,* G.

---

[1]. For example, without questioning the defense itself, one might question the utility of permitting a condemned mass murderer to escape from a prison conflagration.

Fletcher, Rethinking Criminal Law, 759–875 (1978). *Cf.*, J. Thomson, Rights, Restitution and Risk, 78–116 (1986) (some reflections on the trolley problem). At any rate this doubt would not prevent me from joining in the majority's opinion.

I do, however, feel that the law of this circuit constrains me from saying that the necessity defense is not available in these kinds of cases. That law is canvassed in the majority's opinion and need not be restated by me. Of course, the majority is exactly right about the outcome of this case. It is also probably right about the outcome of all other cases of this type in the future. Those who would think to use this defense should first think deeply about what the majority has written.

Therefore, I concur in the result.