**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Rick Paul SPRINGER, Defendant– Appellant.**

**No. 94–10148.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 16, 1995.

Decided April 3, 1995.

---

John C. Lambrose, Deputy Federal Public Defender, Las Vegas, NV, for defendant-appellant.

John E. Ham and Jamon A. Jarvis, Asst. U.S. Attys., Las Vegas, NV, for plaintiff-appellee.

Before: NORRIS, WIGGINS, and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

Rick Paul Springer was convicted of failing to surrender for the service of his sentence for a previous crime. *See* 18 U.S.C. § 3146(a)(2). He represented himself and now claims that he was not properly questioned about his waiver of counsel. He also asserts that the district court erred in its rulings regarding his defense, which was, in effect, that because of his opposition to nuclear bomb testing he could not report. We affirm.

## BACKGROUND

Springer, who was opposed to nuclear bomb testing, felt called upon to interfere with a ceremony where former President Ronald Reagan was receiving a gift of a crystal eagle. Springer destroyed the eagle because he thought that would be an appropriate way to call attention to a nuclear bomb test scheduled for the next day. As a result, he was convicted of interference with the Secret Service and was sentenced to 120 days of incarceration for that offense. *See* 18 U.S.C. § 3056(d). He was ordered to surrender on April 2, 1993, but that date was later extended to June 2, 1993.

Springer determined that he would not surrender because something more important held his attention. He was concerned that a moratorium on nuclear testing was about to end, so he decided that jail could not be permitted to interfere with his desire to engage in protests against that possibility. He also saw his action, his refusal to surrender, as a form of civil resistance. By June 27, 1993, he discovered that the President had extended the moratorium. He still did not surrender. As he said, he wanted his surrender to be a media event, and he had not quite figured out how to finance or accomplish that. He was finally arrested on August 9, 1993, and this prosecution for failure to surrender ensued. *See* 18 U.S.C. § 3146(a)(2).

Before his first trial, the district court held a pretrial conference at which Springer expressed his desire to represent himself. The district court carefully canvassed him on that desire and accepted his request after first determining that the waiver was knowing and intelligent. The court also appointed an attorney to serve as advisory standby counsel for Springer.

The first trial ended in a mistrial on October 27, 1993. His retrial commenced before a different judge on January 18, 1994. At that time the district court did not make a further inquiry into Springer's waiver of counsel, but Springer expressly stated that he was representing himself, and the same advisory standby counsel was also present. This time Springer was convicted and sentenced. This appeal followed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 1291.

■ Whether a defendant knowingly, voluntarily and intelligently waived his Sixth Amendment right to counsel is a mixed question of law and fact that we review *de novo*. *See United States v. Robinson*, 913 F.2d 712, 714 (9th Cir.1990), *cert. denied*, 498 U.S. 1104, 111 S.Ct. 1006, 112 L.Ed.2d 1089 (1991). "A district court's application of the Speedy Trial Act is reviewed *de novo*." *United States v. Clymer*, 25 F.3d 824, 827 n. 1 (9th Cir.1994) (citation omitted). A district court's decision to bar a necessity defense is also reviewed *de novo*. *See United States v. Schoon*, 971 F.2d 193, 195 (9th Cir.1991), *cert. denied*, 504 U.S. 990, 112 S.Ct. 2980, 119 L.Ed.2d 598 (1992).

■ The district court's decision on whether to admit evidence is reviewed for abuse of discretion. *See United States v. Brooke*, 4 F.3d 1480, 1487 (9th Cir.1993). Finally, a district court's response to a jury's request for additional instructions is reviewed for abuse of discretion. *See United States v. Tham*, 665 F.2d 855, 858 (9th Cir. 1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 466 (1982).

## DISCUSSION

■ Springer raises a number of issues. He claims that he did not properly waive counsel at his retrial, that the retrial did not commence in a timely fashion, and that his defenses, which centered on his need to protest, were improperly denied to him.[1] Although these claims are essentially foreclosed by our precedents, we have carefully considered each of them.

### A. *Waiver of Counsel.*

■ There is no doubt that Springer's waiver of counsel before the initial trial was knowing, voluntary, and intelligent, nor is there any doubt that he was properly canvassed about that waiver. He does not argue to the contrary. His claim is that he should have been recanvassed just before the commencement of the retrial, even though he never hinted that he wished to reconsider his waiver, and, in fact, expressly stated that he would be representing himself. We disagree.

Had Springer sought to withdraw his waiver before his retrial, there can be little doubt that he should have been permitted to do so. *See Menefield v. Borg*, 881 F.2d 696, 699–701 (9th Cir.1989) (waiver withdrawn for new trial hearing); *United States v. Kennard*, 799 F.2d 556, 557 (9th Cir.1986) (waiver withdrawn before retrial). That is not this case. Here, Springer asserted the right to self-representation and was granted that right; he never wavered in his resolve. As we said in *Arnold v. United States*, 414 F.2d 1056, 1059 (9th Cir.1969), *cert. denied*, 396 U.S. 1021, 90 S.Ct. 593, 24 L.Ed.2d 514 (1970):

> While it is true that the Sixth Amendment right to counsel applies at all critical stages of the prosecution, including the sentencing stage, it does not follow that once the assistance of counsel in court has been competently waived, a new waiver must be obtained at every subsequent court appearance by the defendant. A competent election by the defendant to represent himself and to decline the assistance of counsel once made before the court carries forward through all further proceedings in that case unless appointment of counsel for subsequent proceedings is expressly requested by the defendant or there are circumstances which suggest that the waiver was limited to a particular stage of the proceedings.

We reached a similar conclusion in *White v. United States*, 354 F.2d 22 (9th Cir.1965). There counsel was waived, a plea was taken,

---

1. Springer also complains that the trial judge treated him unfairly. Our review of the record belies that claim. Springer was argumentative and refused to accept the trial judge's rulings. It does not appear that Springer objected to the judge's conduct at trial, and we detect no plain error. *See United States v. Sanchez–Lopez*, 879 F.2d 541, 551–53 (9th Cir.1989). Even if he had objected, the judge showed much patience and did not deny Springer a fair trial. *See United States v. Mostella*, 802 F.2d 358, 361 (9th Cir. 1986).

sentence was imposed, and the sentence was then modified. We granted a writ of habeas corpus and ordered resentencing. At the new sentencing hearing, White continued to represent himself and was not requestioned by the district court about his waiver. He appealed and we said:

> White gave no indication at the hearing at which the sentences were reimposed that he did not understand that he had a right to the assistance of counsel at that hearing, or that he wished to withdraw his waiver previously given. Under these circumstances the court was entitled to assume that the waiver was still in effect, and was not required to again advise White of his right to counsel.

*Id.* at 23.

We see no cogent reason to apply a different rule here. The retrial was obviously a continuation of the criminal prosecution, and the waiver was obviously intended to stand absent an attempt to withdraw it. The matter of representation was in Springer's hands alone. After his earnest and insistent request, he had been granted the right to represent himself. If he found himself wavering in his resolve so to do, he or his advisory counsel could have so informed the court. He did not waiver. His waiver of counsel stood. His banausic post hoc claim that he should have been requestioned is, therefore, rejected.

### B. *Speedy Trial Act.*

■ Springer's retrial began eighty-two days after the mistrial was declared in his first trial. The Speedy Trial Act requires that a retrial commence within seventy days. 18 U.S.C. § 3161(e). However, it also allows the exclusion of "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). Here the government did file a pretrial motion on November 30, 1993, which was ruled upon on January 12, 1994. That forty-three-day period was properly excluded, although it should be noted that an exclusion of only thirteen days would be just as effective for Speedy Trial Act purposes. Springer claims that the mo-

tion was frivolous and, therefore, that no exclusion of time was proper. We disagree with this inventive assertion.

The statute does not contain a requirement that the merits of a motion be assessed before a delay is permitted. In fact, we have eschewed requests that we assess the reasonableness of a delay that results from the making of a pretrial motion. *See Clymer,* 25 F.3d at 830. We now decline to further complicate an already complicated area of the law by requiring a district court to assess the merits of a motion before it determines that an exclusion of time will be permitted. That circular process, which would apply to motions from either party, would cause untold confusion and open new vistas of manipulation unrelated to the merits of cases. In so holding, we do not mean to agree with Springer that the government's motion in limine *was* frivolous. In fact, it was not. However, there is no real need to decide that issue at all.

Springer claims that our decision in *Clymer, id.,* means that motions in limine cannot rise to the level of excludable time because trial *could* start without a decision upon them. That is a misreading of *Clymer.* All we decided there was that when the district court put off hearing on a motion "until after trial" the motion could not possibly have delayed the commencement of the trial. *Id.* at 830–31. On the contrary, trial delayed hearing of the motion. *Id.* That, and only that, precluded the exclusion of time for Speedy Trial Act purposes. That does not help Springer. Moreover, *Clymer* did not hold that the time *before* the district court decided to continue the pretrial motion until after trial must be counted; it refused to allow exclusion of time that passed *after* the district court made its decision. *Id.* at 829–30. In the case at hand, only the time prior to the court's ruling on January 12, 1994 was excluded. There was no attempt to exclude the time *after* the court ruled. Had there been, *Clymer* would, of course, be relevant. As it is, it is not.

### C. *Springer's Defenses.*

Springer had essentially two defenses to the charges against him. Both of those re-

volved around his voluntary and conscious decision not to surrender himself. He preferred to remain out of jail protesting nuclear bomb testing and engaging in civil resistance to the court order. His first defense was one of necessity. The second was the closely related defense of uncontrollable circumstances. Neither has any validity under the circumstances of this case.

■ (1) *Necessity.* Springer's claim that he violated the law which required him to surrender because he wished to protest nuclear bomb testing instead cannot spell out a necessity defense. We made that pellucid in *Schoon*, 971 F.2d at 193. Springer's failure to appear was not a challenge to the law under which he was charged. It was, in effect, driven by a desire to challenge laws which might permit nuclear bomb testing to go forward. Therefore, it was "indirect civil disobedience" at best. *Id.* at 196. We need not repeat the detailed and scholarly analysis contained in *Schoon* and need only state its conclusion. "[W]e conclude ... that the necessity defense is inapplicable to cases involving indirect civil disobedience." *Id.* Therefore, the district court did not err when it refused to instruct the jury on the necessity defense.

■ (2) *Uncontrollable Circumstances.* When Congress adopted 18 U.S.C. § 3146, it was obviously concerned that people might fail to surrender because they could not do so. Congress did not want to impose a criminal sanction if that should occur. Therefore, it provided an affirmative defense in the following language:

It is an affirmative defense to a prosecution under this section that uncontrollable circumstances prevented the person from appearing or surrendering, and that the person did not contribute to the creation of such circumstances in reckless disregard of the requirement to appear or surrender, and that the person appeared or surrendered as soon as such circumstances ceased to exist.

18 U.S.C. § 3146(c).

This language, on its face, exudes a concern that something will actually prevent a person from surrendering. The very idea of "uncontrollable" is something that cannot be managed, something that is ungovernable. The very idea of "prevent" is something that forestalls, frustrates or deprives one of the power of acting. That does not describe a situation where a person sits down and decides that he simply will not do something, even though he can do it. It does not describe a conscious decision-making process wherein a person decides that some political or moral value is simply more important (even much more important) than obeying the law which requires his surrender.

What Springer asks us to do now is launch upon the same kind of voyage that we ended when we decided *Schoon.* He asks us to imagine a cause—unrelated to his surrender—which is so important that he could simply decide not to show up. In *Schoon* we put our finger on the reason for refusing to interpret the statute in that manner when we said:

The real problem here is that litigants are trying to distort to their purposes an age-old common law doctrine meant for a very different set of circumstances. What these cases are really about is gaining notoriety for a cause—the defense allows protesters to get their political grievances discussed in a courtroom. It is precisely this political motive that has left some courts, like the district court in this case, uneasy. Because these attempts to invoke the necessity defense "force the courts to choose among causes they should make legitimate by extending the defense of necessity," and because the criminal acts, themselves, do not maximize social good, they should be subject to a *per se* rule of exclusion.

971 F.2d at 199 (citations omitted). In *Schoon* we decided that the historic limitations upon the necessity doctrine led to the ineluctable conclusion that indirect protests of congressional policies could "never" satisfy that defense's elements. *Id.* We see no reason to adopt a different view regarding the defense of uncontrollable circumstances.

In this we are supported by the language of the statute, the legislative history, and the case authority. We have already cited the

language of the statute and noted its seeming emphasis on actual physical restraint.

The Senate Report regarding the statute is also instructive:

It is intended that the defense should apply where, for example, a person is recuperating from a heart attack and to leave his bed would imperil his life, or, after he had made careful plans for transportation to the court house, his vehicle breaks down or unexpected weather conditions bring traffic to a halt. The requirement of appearance or surrender as soon as circumstances permit was included by the Committee for two reasons: first, in order to confirm the defendant's lack of bad faith in failing to appear or surrender; and, second, to encourage the defendant to appear or surrender even after he fails to so do as required.

S.Rep. No. 225, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N. 3182, 3215. In that regard, it should be observed that the emphasis is upon physical conditions which act upon the defendant and absolutely block his surrender. We need not decide whether a person could be afflicted with a mental disease which acted in the same manner as a physical force or a physical disease. Springer does not claim that he was incompetent; he simply claims that something more important than surrender gripped his attention and energies. That is just another way of saying that he voluntarily chose not to surrender because he would rather do something else. In fact, his activities after the immediate moratorium crisis ended served to underscore his true claim. He still did not. choose to surrender. He decided, instead, that he would present himself in his own good time and in circumstances that he would find most congenial.

Judicial authority is no more helpful to Springer's claim. In *United States v. Chappell*, for example, the defendant asserted that he could not surrender because he had to defend the assets of other people (his clients) which might otherwise be ravaged by the agents of the Internal Revenue Service. 854 F.2d 190, 195 (7th Cir.1988). He asked that the jury be instructed in the language of § 3146(c), even though it was not in existence

at the time of his offense. The court determined that he had failed to draw the causal link between the actions of the Internal Revenue Service and his failure to appear. Duress (or necessity) had, therefore, not been shown. *Id.* Similarly, in a pre- § 3146(c) case, we held that a claim that someone was trying to kill the defendant did not justify his failure to appear for trial. We put it this way:

Atencio was not in danger from Garcia because of his upcoming trial date, but rather from a matter not directly related to his appearance in court. Given the great concern which one should attach to a solemn vow to appear in court on a given trial date, one must be expected to seek alternate means of protection before fleeing the country to avoid a perceived danger.

*United States v. Atencio*, 586 F.2d 744, 747 (9th Cir.1978). Here, too, Springer's solemn vow to surrender himself should have been obeyed, despite his belief that a nuclear test moratorium was more important than that.

Defendants have fared no better under § 3146(c) itself. Thus, when a defendant claimed that he had lost faith in the judicial system and that he would be retaliated against if he appeared, the court denied his uncontrollable circumstances defense. *United States v. Veilleux*, 40 F.3d 9, 10 (1st Cir.1994). While the court did agree that there could be uncontrollable circumstances where there was an "unavoidable fear of 'serious bodily injury or death,'" nothing in its discussion suggested that it would countenance the kind of claim that Springer is making. *Id.* at 10 (citation omitted). *See also United States v. Gardiner*, 955 F.2d 1492, 1497 (11th Cir.1992). Finally, in *United States v. Odufowora*, the court rejected the claim that a fear of deportation was an uncontrollable circumstance. 814 F.2d 73, 74–75 (1st Cir.1987). The court pointed out that the fear in question was not the kind of circumstance reflected in the statute or in the legislative history.

Springer's uncontrollable circumstances claim also faces another hurdle. If the uncontrollable circumstance was the possibility of a lifting of the moratorium on nuclear

bomb testing, it is apparent that Springer did not surrender as soon as *that* circumstance ceased to exist. The President's decision to continue the moratorium was made by June 27, 1993, but Springer still did not surrender. In fact, he never did surrender. Rather, he was arrested on August 9, 1993. Of course, Springer might have considered his desire to attract more publicity to the danger of nuclear testing as an uncontrollable circumstance in itself, which prevented his surrender because he had not yet figured out how to obtain the resources to accomplish that media event. That would be in keeping with his original offense regarding the crystal eagle and further in keeping with his desire to engage in civil resistance. If so, that reason falls just as surely as his primary reason does.

■ In short, guided by common sense and *Schoon,* we hold that a desire to make a political statement or engage in protest activity which is not directly related to § 3146 itself is not an uncontrollable circumstance. This determination disposes of Springer's claims about (a) exclusion of evidence and (b) jury instructions.

■ (a) *Exclusion of Evidence; Expert Testimony.* Springer asserts that the district court should have allowed expert testimony on the state of nuclear weapons testing in 1993 and on Springer's claim that he was obeying international law. However, all of that was irrelevant to a claim that an uncontrollable circumstance kept him from obeying his surrender promise. It did not go to a fact properly in issue. *See United States v. Rincon,* 28 F.3d 921, 923 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 605, 130 L.Ed.2d 516 (1994). Were his beliefs and his desire to protest proper grounds for an uncontrollable circumstance claim, the result might well be different. That, as we have explained, is not the case. The district judge did not abuse his discretion when he refused to admit the expert testimony.

■ (b) *Jury Instructions.* The district court did instruct the jury on the uncontrollable circumstance defense. However, Springer complains because, in response to a question from the jury, the court stated that a deeply held "moral, political or religious belief" was not an uncontrollable circumstance. However, under the facts of this case Springer was not entitled to an uncontrollable circumstance instruction in the first place. There simply was no evidence to establish that defense, so the court could not have prejudiced him by imposing a limitation. *See Chappell,* 854 F.2d at 196. As it was, the court's generosity in instructing on the uncontrollable circumstance defense at all probably resulted in the first mistrial and did raise a chimera before the eyes of the jury in the second one. We need not, and do not, decide whether there could be a belief held with such intensity that it became a phobia or other mental disease, which would, in turn, rise to the level of the physical constraints clearly contemplated by the statute. Suffice it to say that there is no evidence to suggest that this is *that* case, nor does Springer argue that it is.

## CONCLUSION

Springer believed that nuclear bomb testing is dangerous to all humanity, including himself. There is much support for that view. Indeed, there is little reason to doubt it. He also feared that testing would become recrudescent in this country. But Springer had been sentenced for a crime against the United States and had been allowed to self surrender upon his promise that he would do so. He did not do so because he wished to protest what he feared United States policy was about to become. He asserts that he was driven by necessity and faced with uncontrollable circumstances.

While we are not insouciant about Springer's concerns, we cannot agree with his definition of his obligation to obey the law. Neither defense was available to him for his act of indirect civil disobedience. Neither could justify his failure to surrender as promised and ordered. If he wished to continue his protest, he had to do so after his surrender— either from his jail cell or after he served his 120–day sentence. At any rate, he could not with impunity decide that he would practice civil resistance by refusing to surrender. We in no way denigrate his claim that he must

answer to his conscience when we say that he must answer to the law.

AFFIRMED.