153 F.3d 931
 98 Cal. Daily Op. Serv. 6400, 98 Daily Journal
D.A.R. 8863
UNITED STATES of America, Plaintiff-Appellee,
v.
Salvador AVILES, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Miguel Angel BARRENECHEA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rafael CORNEJO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carlos A. PEREZ, Defendant-Appellant.
 Nos. 96-10110, 96-10167, 97-10251 and 97-10289.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 14, 1998.
Decided Aug. 18, 1998.
 
 Robert R. Riggs, Katzoff & Riggs, Cobb, California, for defendant-appellant Salvador Aviles.
 Karen L. Landau, Oakland, California, for defendant-appellant Miguel Angel Barrenechea.
 Suzanne A. Luban, Berkeley, California, for defendant-appellant Rafael Cornejo.
 Robert D. Bacon, Oakland, California, for defendant-appellant Carlos A. Perez.
 Albert S. Glenn, C. David Hall, Stephen G. Corrigan, Theresa J. Canepa, Assistant United States Attorneys, San Francisco, California, for the plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of California; Thelton E. Henderson, District Judge, Presiding. D.C. No. CR-92-403-TEH.
 Before: NOONAN, TROTT, Circuit Judges, and WALLACH,* Judge.
 NOONAN, Circuit Judge:
 
 
 1
 Rafael Cornejo, Salvador Aviles, Miguel Angel Barrenechea and Carlos A. Perez appeal their convictions and sentences for offenses involving the distribution of cocaine. Their principal challenges go to the wiretap evidence against them and to the government's compliance with the Speedy Trial Act.
 
 
 2
 The Wiretaps. The Organized Crime Drug Enforcement Task Force (the Task Force) brought together federal and local agencies under the leadership of Special Agent Don A. Allen of the Federal Bureau of Investigation (the FBI). In May 1991, the Task Force began an investigation of Cornejo, who was a suspected drug dealer, a felon already convicted of income tax evasion, and an associate of known drug dealers. The Task Force employed surveillance of Cornejo's home in Lafayette, California. Due to the location of the house off a narrow street without shoulders, surveillance was difficult. The Task Force learned from a prisoner awaiting sentence that Cornejo and his half-brother Aviles intended to purchase cocaine from Oscar Danilo Blandon-Reyes in September 1991. The purchase was for $300,000 and executed by shipments of a total of 81 kilograms of cocaine from North Hollywood to San Francisco. The shipments were made in the hidden compartment of a blue Nissan station wagon. The driver of one of the shipments was Mauricio Antonio Gonzalez, a felon previously convicted of possessing cocaine with the intent to distribute. By May 12, 1992, Blandon had been indicted and his arrest was imminent.
 
 
 3
 The Task Force drew on an FBI Special Agent acting undercover to penetrate the money laundering of certain drug dealers. The agent identified Juan Masao Nomura as a key broker in Colombia. Through arrangements with this broker, on May 16, 1991 the agent received $110,000 to be wired to an account at the Banco Del Estador in Palmira-Valle, Colombia. Surveillance of the depositors of the cash revealed them to be Cornejo and Aviles.
 
 
 4
 The Task Force employed telephone toll records and court-authorized pen registers (devices mechanically recording the number called by, or calling to, a particular phone and the duration of the call) to draw inferences as to Cornejo's customers. Through these telephone records a close business connection between Cornejo and Donald Pomeroy Roberts, Jr. of Portland, Oregon, was indicated. Roberts, a former felon convicted of the possession of marijuana, was already under investigation for drug dealing. On December 19, 1991, Special Agent Allen, working undercover, met Roberts and heard from him that Roberts' friendship with Cornejo had begun in 1977 when they were both imprisoned in Panama on charges of smuggling cocaine. Roberts asked Allen in his undercover guise to launder between $50,000 and $100,000. On April 1, 1992 Roberts was arrested and indicted for violation of federal narcotics laws.
 
 
 5
 By similar recordings of telephone calls at least eight other persons were identified as probable customers of Cornejo; six of them had criminal records. Among the latter was Miguel Angel Barrenechea, who had a pager programmed to call a number believed to be Cornejo's. On April 3, 1992, Steve Tse, a Special Agent of the Drug Enforcement Agency (DEA) in San Francisco, advised Agent Allen that he was investigating Barrenechea for the importation and distribution of cocaine in the San Francisco area. On April 1, Tse, operating undercover, had discussed a potential purchase of drugs from Barrenechea. Agent Tse stated he believed Barrenechea sold between 150 and 200 kilograms of cocaine per month.
 
 
 6
 All of the above information was contained in a seventy-eight page affidavit sworn to by Agent Allen. Theresa J. Canepa, Assistant United States Attorney, submitted the affidavit in support of the government's application for authorization of a thirty-day wiretap. The government sought a wiretap of two telephones used by Cornejo. The district court granted the government's initial application as well as two extensions.
 
 
 7
 At the time the first application was made, the government had shown, using ordinary methods of investigation, that it had enough evidence to indict Blandon, a supplier of Cornejo in the south, and enough evidence to indict Roberts, a purchaser from Cornejo in the north. The government also had evidence of Cornejo and Aviles's money-laundering. The government wanted more. As Agent Allen put it in his affidavit, the Task Force wanted "to knock out the entire organization." For that reason the wiretaps were sought.
 
 
 8
 The defendants attack Allen's affidavit of May 15, 1992 for omitting information about Agent Tse's investigation of Barrenechea and for not indicating the possibility that Roberts might cooperate with the government. The statute requires the law enforcement officer who seeks authorization to supply the authorizing court with "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Agent Allen, the defendants contend, did not meet the statutory standard.
 
 
 9
 The reason Allen did not say more about Tse's investigation of Barrenechea was that Tse had been closemouthed about it, even at a meeting on April 15, 1992 with Allen and AUSA Canepa where Tse was informed that a wiretap application was being considered. Tse was closemouthed to protect his own investigation. As Allen testified, such things are not common, but they do occur. They are the bane of government--agencies charged with overlapping tasks sometimes more zealous in protecting their turf than in achieving the common objective.
 
 
 10
 If Tse had told Canepa all he had done, Allen would have had available for his affidavit the following information: Working undercover, Tse first met Barrenechea on January 14, 1992. Barrenechea offered to sell large quantities of cocaine at a price of $15,000 per kilo if the buyer purchased 50 kilograms or more. Three days later they met again. Barrenechea again offered to arrange for the sale of a large quantity of cocaine. He also offered multi-ton quantities of marijuana that he said came from San Diego. He invited Tse to accompany him to San Diego or Los Angeles; Tse did not want to go and declined the invitation. Barrenechea said he frequently drove to Los Angeles for cocaine. The next contact occurred March 10 when Barrenechea paged Tse, and Tse told him he was interested in buying cocaine; a similar conversation occurred on March 26, again without any transaction taking place. On April 1, 1992 they met again and discussed price. Again Barrenechea invited Tse to accompany him to Los Angeles, and again Tse declined. Over the next several days they met or spoke several times dickering over the price and quantity Barrenechea would sell. Tse thought Barrenechea was exaggerating his ability to deliver cocaine. After a meeting on April 20, 1992, Tse did not see Barrenechea again before the date of Allen's May 15, 1992 affidavit.
 
 
 11
 What Tse could have told Allen before he filed the affidavit was developed at a Franks hearing lasting four days before a magistrate judge prior to trial in this case. The magistrate judge found that the government had made no intentional or reckless misstatements or omissions in applying for the wiretaps and that, even if it had, nothing material had been misstated or omitted. The district court reviewed the magistrate judge's report de novo and denied the defendants' motion to suppress. The court ruled that Tse had no duty to disclose to Allen the details of his investigation of Barrenechea, despite Tse's awareness of Allen's intention to apply for authorization of a wiretap. The court further found that the omitted statements were immaterial to the authorizing judge's finding of necessity for the wiretaps.
 
 
 12
 Agent Tse knew that Allen, a fellow task force member, was preparing an affidavit in support of an application for court-ordered electronic surveillance. An agent in Agent Tse's position has an obligation to disclose to a fellow task force member all information material to such an application. Tse's failure to discharge this obligation was an error. It is as a representative of the government that an applicant for a wiretap authorization applies to the court. The government cannot so compartmentalize its activities that it hides from the court information that might be relevant.
 
 
 13
 Tse's duty, if he had material facts, was enforceable by AUSA Canepa going to Tse's superiors in the DEA and obtaining reports she must have known he would have made. The sanction for failure to get these reports and for Tse's silence is the risk that the wiretap application be held invalid. Tse's failure to disclose reports in his possession was intentional on Tse's part, and his intention is attributable to Agent Allen. See United States v. Jacobs, 986 F.2d 1231, 1234 (8th Cir.1993); see also United States v. Wood, 57 F.3d 733, 737 (9th Cir.1995) (for Brady purposes, prosecutor charged with knowledge of material known to FDA). Tse's motive in withholding material information would have been irrelevant.
 
 
 14
 Now apprised of what Tse could and should have told Allen, we conclude that Tse's error was harmless because the information Tse improperly held back was not material to Allen's affidavit. At the most, what Tse knew was that Barrenechea was a possible large-scale purchaser of cocaine and of marijuana in southern California. Coupled with the information Allen had and disclosed, the information possessed by Tse suggested that Barrenechea might be a large customer of Cornejo. Even if a deal had been arranged, such contact with Barrenechea did not afford a way of penetrating Cornejo's operation. Over a period of over three months it had been difficult for Tse to make any firm arrangement to buy cocaine from Barrenechea. The defendants' speculation that if Tse had accepted the invitation to go to Los Angeles he would have been led to Cornejo's supplier is mere speculation--speculation that the wary Barrenechea would have actually taken Tse to such a person. Barrenechea was not inside the organization; the defendant's reliance on United States v. Simpson, 813 F.2d 1462, 1467 (9th Cir.1987), cert. denied, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987) (FBI informant having regular sex with defendant drug suspect), falls short when invoked as analogy for Barrenechea. An impartial judge considering Allen's affidavit with the Tse information added would still have seen the necessity of wiretaps for the government to "knock out the entire organization."
 
 
 15
 In the April 15, 1992 meeting of Tse with Allen and Canepa, Tse said the DEA didn't have money for a buy from Barrenechea and declined an offer from the FBI to provide the money. On June 25, 1992, the DEA formally joined the Task Force investigation of Cornejo and accepted the FBI's offer of buy money. Ultimately, on July 22, 1992, Barrenechea sold Tse eight ounces of cocaine, probably acquired from Cornejo. This relatively tiny transaction provides retrospective confirmation that Tse's contacts with Barrenechea revealed little about Cornejo's organization.
 
 
 16
 As to Donald Roberts, Roberts's lawyer advised Allen soon after Roberts's arrest that Roberts might be willing to cooperate with the government. Allen had not primed the United States Attorney's office in Portland with any questions he would like Roberts to answer. Allen himself did not want to question Roberts lest it tip him off on the San Francisco investigation of Cornejo. As Allen stated in his affidavit of May 15, Roberts had not in fact cooperated by that date. No realistic objection can be made to this report. Allen was entitled to wait strategically for the effective debriefing of Roberts.
 
 
 17
 By early June the situation had changed, and Roberts was responding to the government's inquiries about his customers in Portland. Beginning on June 8 Roberts was debriefed on Cornejo. Allen did not attempt to advise the questioner, a more senior FBI agent who was aware of Allen's Cornejo investigation, what he should ask. Roberts told the government that from the fall of 1990 up to his arrest in 1992 he had bought cocaine only from Cornejo; that he bought 3 to 5 kilos a month; that he would travel to Lafayette, California to pick up the cocaine or that Aviles or Cornejo himself would drive to Portland and deliver it; that the cocaine would be hidden in a secret compartment of an automobile; that Roberts had made one pickup of cocaine in the company of Patrick Smith and another pickup in the company of Dan McKenzie; and that Cornejo had made certain investments in real estate. All of this information was new to Allen.
 
 
 18
 In his June 18, 1992 application for an extension of the wiretaps, Allen added four additional interceptees, three with criminal histories. The telephone taps had revealed Cornejo to be in financial trouble and engaged in some drug dealing. Barrenechea had offered Cornejo one kilo of cocaine. Under the heading "Recent Developments," Allen reported Blandon's arrest on May 15, 1992 and the fact that "Blandon has provided information regarding narcotics activities in Southern California to assist the DEA in its continuing investigation." Allen went on to report that Roberts had "agreed to assist Portland FBI agents by providing information" regarding the Task Force's case. Roberts was further reported to have "stated, in sum, that Rafael Cornejo was his source of supply for cocaine, and that when he would stay at the Lafayette Park Hotel in Lafayette, California, he did so in order to buy cocaine from Cornejo." Allen added: "Although Blandon, Roberts, and Knight [Roberts' girlfriend] have agreed to cooperate with these investigations, none of these individuals has provided any substantial information regarding Rafael Cornejo to date."
 
 
 19
 The last statement was not accurate and was misleading. Roberts had provided information that was later the basis for ten overt acts alleged in the conspiracy count. Roberts had told how both Aviles and Cornejo delivered cocaine, how it was transported, and how it was concealed. Roberts had admitted that for over two years Cornejo had been his regular and substantial supplier.
 
 
 20
 Allen's skimpy summary ignored the requirements of the statute, as if an application for an extension did not have to meet the exacting statutory requirement of "a full and complete statement." The authorizing court was not informed of the abundance of information supplied by Roberts. Rather, the court was actually misled by the statement that Roberts had not provided "any substantial information about Rafael Cornejo."
 
 
 21
 The magistrate judge recommended against suppressing the evidence obtained on the basis of the June 18 wiretap affidavit, and the district court agreed. It held that the omission of "the details" was not "intended to mislead the issuing judge or made with reckless disregard for the possibility that he would be misled." It held further that the omissions were immaterial because, as the magistrate judge had found, Roberts had no knowledge of Cornejo's sources of supply, his stash houses or his money-laundering and no knowledge of several other defendants in the case.
 
 
 22
 We do not accept the district court's finding. Allen's statement regarding the lack of substantive information provided by Roberts was misleading. The statement needed serious qualification to be accurate. The statement was made deliberately to a court. It must be judged as a statement intentionally made. What was new to Allen would also have been new to the authorizing judge. Outstanding as Allen's management of the investigation had been, in this instance he made a judgment call the court should have been asked to make.
 
 
 23
 Whether the statement and the related omissions were material is a closer question. An impartial judge aware that Roberts was Cornejo's best friend and that he was "singing" might well have wondered if Roberts did not have more to say. Such a judge might have concluded that the standard use of a cooperative co-conspirator obviated the need for further wiretaps. On the other hand, the magistrate judge and the district court were correct in noting several areas where Roberts was not likely to have information and had in fact provided no information over three days of debriefing. Given that Cornejo was shown to be dealing cocaine on a wide scale, the authorizing judge would doubtless have let the wiretaps continue in order to catch the entire organization even if Roberts's debriefing had been fully and accurately reported. A coup de grace to the organization needed more than Roberts could provide. Wiretaps were the way to this consummation. The information about Roberts was, in the final analysis, not material to the decision on letting the taps continue.
 
 
 24
 Over 170 million telephones are in use in the United States. International Telecommunications Union, 1996 Telecommunication Indicators Report 3 ("Basic Indicators") (1997). Federal district courts annually approve over 500 requests for authorization to tap one of these telephones. Leonidas Ralph Mecham, Administrative Office of the United States Courts, Applications for Orders Authorizing or Approving the Interception of Wire, Oral, or Electronic Communications 30 (1998). Requests, therefore, are a small fraction of one per cent of the telephones in use. Requests are very rarely denied. Id. The statistics strongly suggest that the statute is effective in restraining telephone tapping by federal law enforcement agencies. The requests for authorization are normally found to be justified. These background facts increase the unlikelihood that the authorizing court would have denied the extensions if it had been given the new Roberts material. We conclude that the district court did not err in not suppressing the wiretap evidence.
 
 
 25
 Compliance With Speedy Trial Act.
 
 
 26
 A defendant must be brought to trial within seventy days of indictment. 18 U.S.C. § 3161(c)(1). The last defendant was indicted on December 17, 1992. The Speedy Trial Act began to run from this date and continued to run until June 12, 1995 when Cornejo moved to dismiss the indictment for violation of the Act. Nine hundred and seven days had elapsed. Cornejo's motion should have been granted unless eight hundred thirty seven days were excludable under specific provisions of the statute.
 
 
 27
 The government points to pretrial motions and to continuances granted by the district court with appropriate findings, which led to excludable delays under § 3161(h)(1)(F) and 3161(h)(8)(A). We calculate these times not counting the day the motion was filed or the day it was heard. See United States v. Springer, 51 F.3d 861, 865 (9th Cir.1995) (finding an exclusion of forty-three days for a motion filed on November 30, 1993 and ruled upon January 12, 1994). We also note that the district court has only thirty days after it takes a motion under advisement before the Speedy Trial Act clock begins to run again, 18 U.S.C. § 3161(h)(1)(J); Henderson v. United States, 476 U.S. 321, 328-29, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986); United States v. Dezeler, 81 F.3d 86, 88 (8th Cir.1996); consequently we exclude certain pretrial motion time after March 4, 1993 as the motion was taken under advisement on February 1, 1993. We do not count continuances granted by the district court where it made no specific findings supporting a general mantra of "complexity." United States v. Clymer, 25 F.3d 824, 828 (9th Cir.1994). It is the responsibility of counsel--especially counsel for the government lest the government be mousetrapped--to provide findings to be made by the court demonstrating the complexity alleged. We do count continuances necessary for the preparation of specific pretrial motions. United States v. Hoslett, 998 F.2d 648, 657 (9th Cir.1993).
 
 
 28
 On these premises, there were eight hundred eighty-seven excludable days. The Speedy trial Act was not violated. Our calculations are as follows:
 
 
 29
 Pretrial Motions
 From December 21, 1992
 To March 4, 1993 72 days
 From April 12, 1993
 To May 25, 1993 43 days
 From June 7, 1993
 To February 19, 1994 256 days
 From March 14, 1994
 To April 6, 1994 25 days
 From April 11, 1994
 To May 20, 1994 38 days
 From June 9, 1994
 To June 12, 1995 366 days
 --------
 800 days
 
 
 30
 Continuances
 From December 14, 1992
 To December 20, 1992 5 days
 From May 25, 1993
 To June 6, 1993 13 days
 From February 7, 1994
 To April 18, 1994 69 days
 --------
 87 days
 Total 887 days
 --------
 --------
 
 
 31
 (Brackets are used to indicate date continuances were granted, but the time is counted from the unbracketed date so as not to overlap with time assigned to pretrial motions.)
 
 
 32
 Other issues raised by the appellants are addressed in a memorandum disposition filed together with this opinion. The judgments of the district court are AFFIRMED.
 
 
 
 *
 The Honorable Evan J. Wallach, Judge, U.S. Court of International Trade, sitting by designation